In the Matter of CITIZENS FOR AN ORDERLY ENERGY POLICY, INC., et al., Appellants, v MARIO M. CUOMO, as Governor of the State of New York, et al., Respondents, and PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, Intervenor-Respondent. (Proceeding No. 1.)

In the Matter of J. KENNETH DOLLARD et al., Petitioners, and UNITED STATES OF AMERICA, Intervenor-Petitioner, v LONG ISLAND POWER AUTHORITY et al., Respondents. (Proceeding No. 2.)

Third Department, July 12, 1990

### APPEARANCES OF COUNSEL

*Lewis & Greer (Lou Lewis* of counsel), for appellants.

*Martin S. Kaufman* for petitioners.

*Robert Abrams, Attorney-General (Samuel Cherniak* of counsel), for Mario M. Cuomo, respondent.

*Stanley B. Klimberg,* and *Skadden, Arps, Slate, Meagher & Flom (George A. Zimmerman* of counsel), for Long Island Power Authority, respondent.

*Charles M. Pratt (Arthur T. Cambouris* of counsel), for Power Authority of the State of New York, respondent.

*Victor A. Staffieri (Richard A. Rapp, Jr.,* of counsel), for Long Island Lighting Company, respondent.

*Jacob Lewis* for intervenor-petitioner.

*William J. Cowan (Lawrence G. Malone* of counsel), for Public Service Commission of the State of New York, intervenor-respondent.

### OPINION OF THE COURT

Per Curiam.

Petitioners commenced these CPLR article 78 proceedings to challenge determinations by respondents Governor of New York, Long Island Power Authority (hereinafter LIPA), Power

Authority of the State of New York (hereinafter PASNY), Long Island Lighting Company, Inc. (hereinafter LILCO) and Public Service Commission (hereinafter the PSC) approving or executing agreements involving the closing and decommissioning of the Shoreham Nuclear Power Station in the Town of Brookhaven, Suffolk County. Specifically, petitioners contend that the agreements are in excess of the public respondents' statutory and constitutional authority and that they were adopted in accordance with improper procedures. The proceedings were commenced by two different sets of petitioners, each of which includes individuals, business groups and interest groups.[1] The claims raised in each proceeding are essentially the same, although petitioners in proceeding No. 2 raise additional claims under the State Environmental Quality Review Act (ECL art 8) (hereinafter SEQRA). For convenience, we shall not distinguish among petitioners. Because of the far-reaching social and political ramifications of this dispute and the complicated nature of the case, we shall provide a detailed background.

## I. THE LONG ISLAND POWER AUTHORITY ACT

In 1986, the Long Island Power Authority Act (hereinafter the Act) was enacted (L 1986, ch 517). The Act began with the Legislature's declaration that excessive electricity rates have caused "a serious threat to the economic well-being, health and safety" in the Long Island service area of LILCO, an investor-owned utility servicing Suffolk, Nassau and part of Queens Counties (Public Authorities Law § 1020-a; see, Public Authorities Law § 1020-b [10], [17]).[1] LILCO's investment in Shoreham specifically was declared "imprudent" and the cause of "significant rate increases" (Public Authorities Law § 1020-a). Shoreham's ability to operate was questioned, as was its ability to provide sufficient electricity if it does operate (see, § 1020-a). For these and other reasons, the Legislature declared that "a situation threatening the economy, health and safety exists in the service area" (§ 1020-a). To ensure an adequate, reliable and efficient economic electrical supply, to retain business and to attract new business, the Legislature declared the situation to be a matter of State concern under NY Constitution, article IX, § 3 (a) (3) (see, § 1020-a).

The Legislature found that the situation "best can be dealt

---

1. In proceeding No. 2, the United States of America was granted permission to intervene as a petitioner.

with by replacing [LILCO] with a publicly owned power authority" (Public Authorities Law § 1020-a) and created LIPA as a political subdivision of the State to be operated on a nonprofit basis (see, Public Authorities Law § 1020-c [1], [3]). LIPA is authorized to acquire LILCO's securities or assets through negotiated agreement, tender offer or eminent domain (see, Public Authorities Law § 1020-h). It is specifically empowered to acquire "all or any part of the securities or assets of LILCO" provided that it determines that "the rates projected to be charged after such acquisition and for such reasonable period of time as [LIPA] may determine will not be higher than the rates projected to be charged by LILCO during such period if such acquisition had not occurred" (Public Authorities Law § 1020-h [2]).

Under the Act, LIPA must close and decommission Shoreham and consider possible alternative uses "[a]s soon as practicable after [it] has acquired sufficient shares of LILCO stock to do so or after it has acquired all the property of LILCO" (Public Authorities Law § 1020-h [9]). The Act further prohibits LIPA from constructing or operating a nuclear power plant in the service area (see, Public Authorities Law § 1020-t), although it has power "to determine the location, type, size, construction, lease, purchase, ownership, acquisition, use and operation of any generating, transmission or other related facility" (Public Authorities Law § 1020-g [c]), and "[t]o proceed with the physical construction or completion of any generating, transmission or related facility" (Public Authorities Law § 1020-g [d]). Since the Act and this resulting controversy centers largely around Shoreham, it is appropriate to consider this facility in some detail.

II. SHOREHAM

The Shoreham Nuclear Power Station is an 809-megawatt nuclear-powered electricity generating facility on the north shore of Long Island. It initially was proposed by LILCO in 1965 to help meet substantially increasing electricity demand in the burgeoning New York City suburbs on Long Island. First conceived of as a 540-megawatt nuclear reactor, Shoreham was to cost $124 million and be operational in 1973. Throughout the 1960's and 1970's, construction delays, some with legal origins and others caused by labor, management or construction problems, occurred so that by 1979 the PSC had commenced a proceeding to investigate whether the cost of Shoreham had been incurred prudently. By this time, Shore-

ham's cost had exceeded $2 billion with a completion date sometime in the early 1980's *(see generally, Matter of Long Is. Light. Co. v Public Serv. Commn.,* 134 AD2d 135).

In 1979, an accident involving Unit 2 at the Three Mile Island Nuclear Power Station in Pennsylvania occurred. This incident served to raise public consciousness about nuclear power safety. In response, stringent emergency plan requirements were imposed as part of the licensing procedure by the Nuclear Regulatory Commission (hereinafter the NRC) for nuclear-powered plants (Pub L 96-295, 94 US Stat 780). Concerned about the ability to meet these, or even any, emergency plan requirements, the Governor and Suffolk County have not assisted LILCO in devising or presenting an emergency plan since 1983 and this controversy over the plan continued throughout the 1980's while construction continued *(see, e.g., Cuomo v Long Is. Light. Co.,* 71 NY2d 349). Further delays resulting from construction problems occurred throughout the early 1980's but, by 1984, Shoreham was substantially completed. By 1986, preliminary licenses for Shoreham's operation were authorized by the NRC despite the Governor's opposition *(see, Cuomo v United States Nuclear Regulatory Commn.,* 772 F2d 972). The emergency plan remained essentially the only impediment to Shoreham's full operation. By this time, Shoreham had cost almost $5 billion with carrying costs of some $30 million per month. LILCO's financial condition deteriorated throughout this period.

The licensing process continued and, in April 1989, following protracted, detailed and hotly contested administrative hearings *(see, e.g., Matter of Long Is. Light. Co. [Shoreham Nuclear Power Sta., Unit 1],* 29 NRC 211), the NRC granted LILCO a full operating license for Shoreham. By the time these proceedings were commenced shortly after issuance of the license, Shoreham costs had totaled some $5.5 billion. During these latter phases of the controversy and following enactment of the Act, LIPA began to pursue a takeover of LILCO and acquisition of its assets. This phase of these proceedings will now be addressed.

## III. THE ACQUISITION PROCESS

Following enactment of the Act, LIPA apparently commenced a tender offer in an attempt to acquire control of LILCO. This effort was unsuccessful. Through negotiations, however, respondents and others executed a settlement agreement in 1988. This agreement provided for the transfer of

Shoreham to LIPA for $1, established a schedule of rate increases for LILCO to be submitted to the PSC for its approval and incorporated by reference a "memorandum of understanding concerning proposed agreements on power supply for Long Island" between PASNY and LILCO which set forth, *inter alia,* the terms and conditions upon which PASNY would construct power plants for LILCO. This agreement was expressly conditioned upon approval of the PSC, LILCO's shareholders and the Legislature. Although the PSC approved the agreement, the Legislature failed to act so that the agreement lapsed.

Additional settlement negotiations ensued which culminated in a new settlement agreement signed by LILCO and the Governor in February 1989. This 1989 agreement provided that LILCO would transfer Shoreham to LIPA for $1 pursuant to an "amended and restated asset transfer agreement" and that it would not operate Shoreham pending the transfer. The parties to the 1989 agreement intended for LILCO to "be returned to investment-grade financial condition as an investor-owned electric and gas corporation". The 1989 agreement noted the PSC's approval of a 5.4% temporary rate increase for the rate year ending March 1, 1990 and expressed the parties' anticipation that LILCO's subsequent rate increases would be minimal. It provided for settlement of various litigation, including an appeal by LILCO to the United States Court of Appeals for the Second Circuit from a declaration that the Act was constitutional *(see, Long Is. Light. Co. v Cuomo,* 666 F Supp 370, *appeal dismissed and vacated in part* 888 F2d 230). The 1989 agreement, however, permitted LILCO to reinstate its appeal should LIPA attempt to acquire an interest in LILCO by tender offer, merger, condemnation, proxy contest or any other means.

The 1989 agreement also required LILCO to consult with LIPA in developing a least-cost power supply plan and formulating requests for additional power-generating facilities. These facilities are to be built by PASNY as contemplated by an "amended memorandum of understanding concerning proposed agreements on power supply for Long Island" between PASNY and LILCO, which is incorporated by reference into the 1989 agreement. This amended memorandum provides that PASNY would construct up to three nominal 300-megawatt thermal base load units for LILCO, subject to various conditions and provisions to be negotiated.

The amended and restated asset transfer agreement, incor-

porated by reference into the 1989 agreement, sets forth the precise terms by which Shoreham would be transferred to LIPA. It also contemplates the retransfer to LILCO of certain real property portions of Shoreham after Shoreham is decommissioned. It further contemplates LILCO's right to purchase electricity produced at the Shoreham site if Shoreham is retrofitted for non-nuclear-generated electricity.

The 1989 agreement was supported by a study commissioned by LIPA which shows that LILCO's rates without Shoreham would be cheaper than LILCO's rates with Shoreham. Additionally, the 1989 agreement was expressly conditioned upon various approvals including that of the PSC, LILCO's board of directors and shareholders, LIPA's trustees and PASNY's trustees. These approvals were obtained by April 1989 when LILCO and LIPA executed the amended and restated asset transfer agreement. The stage was set for legal challenge to the 1989 settlement agreement between the Governor and LILCO and the related agreements incorporated therein (hereinafter collectively referred to as the settlement arrangement).

## IV. PROCEEDINGS TO CHALLENGE THE SETTLEMENT ARRANGEMENT

Petitioners in proceeding No. 1 commenced this CPLR article 78 proceeding against the Governor, LIPA, PASNY and LILCO to challenge the validity of the settlement arrangement. These petitioners allege that the settlement arrangement required LIPA and PASNY to exceed their statutory authority, violated separation of powers, due process and equal protection and was approved in violation of the Open Meetings Law (Public Officers Law art 7). After the PSC was granted permission to intervene, respondents answered. Supreme Court dismissed the petition (144 Misc 2d 281), concluding that the settlement arrangement did not violate the respective statutory authorizations of LIPA or PASNY or the constitutional guarantees of due process and equal protection, that it was not adopted in violation of the Open Meetings Law and that it did not evidence any separation of powers infringement by the Governor, LIPA or PASNY. This appeal ensued from the judgment entered thereon.

Petitioners in proceeding No. 2 also commenced a CPLR article 78 proceeding challenging the validity of the settlement arrangement. These petitioners raise essentially the same claims as those in proceeding No. 1. They further allege,

however, that LIPA, PASNY, the PSC and the Governor entered into the settlement arrangement without consideration of an environmental impact statement (hereinafter EIS) pursuant to SEQRA. At about the time respondents answered, these petitioners sought a preliminary injunction enjoining respondents from implementing the settlement arrangement. The United States sought leave to intervene as a petitioner and Supreme Court permitted intervention. Thereafter, Supreme Court denied petitioners' motion for a preliminary injunction and transferred the proceeding to this court for resolution.[2] By our order, the appeal in proceeding No. 1 and the transferred proceeding No. 2 are being heard together.

## V. THE PRIMARY SUBSTANTIVE CONTENTIONS

### A. SEPARATION OF POWERS

Petitioners argue that the settlement arrangement's provisions are beyond the scope of authority of LIPA and PASNY as well as that of the Governor. Specifically, petitioners contend that under the Act, LIPA must acquire all of LILCO before undertaking to close Shoreham and that the settlement arrangement, providing for Shoreham's closure prior to LIPA's replacement of LILCO, is contrary to that requirement. Accordingly, petitioners suggest that the Governor and the executive agencies have impermissibly exceeded their statutory authority. Respondents argue that the settlement arrangement is entirely consistent with the Act. They contend that LIPA is authorized to acquire "all or any" of LILCO's assets and that the acquisition of Shoreham comports with this authority. From this perspective, respondents assert that the public actors executed their duties without any infringement of the separation of powers. The parties' arguments on this point are more extensive, as they point to various provi-

---

■ 2. Although petitioners in proceeding No. 2 raise a question of substantial evidence in their brief to this court, our review of their petition reveals that no substantial evidence issue is raised in these pleadings and, consequently, was not raised before Supreme Court. Since transfer of a CPLR article 78 proceeding is appropriate only where a question of substantial evidence is raised in the petition, transfer of this proceeding was improper (see, CPLR 7804 [g]). We shall, however, retain jurisdiction to promote judicial economy (see, Matter of McGraw-Hill, Inc. v State Tax Commn., 146 AD2d 371, 374, n 3, affd 75 NY2d 852). We once again admonish the trial Bench and Bar to be more attentive to the appropriateness of transfer in CPLR article 78 proceedings as we are concerned with the increasing frequency with which improperly transferred proceedings are appearing on our docket.

sions of the Act to support their respective positions. However, the arguments summarized above reflect those positions.

■ Our analysis convinces us that what the executive branch of the State did or undertook to do for the acquisition and closing of Shoreham was authorized by the Act and, under the circumstances then prevailing, constituted a rational implementation of legislative policy. In our discussion of the separation of powers issue, we shall not distinguish between the Governor and LIPA. With due regard to the precatory language in the 1989 agreement between the Governor and LILCO concerning the parties' intent to improve the investment-grade quality of LILCO's capital stock, the primary if not exclusive legally binding undertakings of the Governor were in stipulating to the discontinuance of various litigation between the State and LILCO then pending in the courts and before administrative agencies, an action well within the Governor's constitutional authority. In all other respects, that agreement was subject to approval by the appropriate State agencies acting, as we have concluded, within their statutorily delegated powers.

The common thread of the case law applying the separation of powers doctrine is that the executive branch may not infringe upon the primacy of the legislative branch in the policy-making function of government. The line is impermissibly crossed most often when the executive acts not pursuant to some express statutory delegation of power, but under a claimed implied general authority to enforce the law. In this situation, the courts have struck down the executive action when it went "beyond stated legislative policy and prescribe[d] a remedial device not embraced by the policy" *(Matter of Broidrick v Lindsay,* 39 NY2d 641, 645-646; *see also, Matter of Fullilove v Beame,* 48 NY2d 376; *Rapp v Carey,* 44 NY2d 157, 163).* In doing so, the legislative province was invaded because the executive "utilized a remedial device which, rather than implementing a legislative policy, enacted a new policy not embraced by the [legislative body]" *(Under 21, Catholic Home Bur. for Dependent Children v City of New York,* 65 NY2d 344, 358).

The decisions, however, recognize the validity of broad delegations by the Legislature of implementing authority, particularly where the subject matter is complex and the future circumstances to be encountered in carrying out the legislative will are not readily foreseeable. Then, the Legislature may define the policy objective of the statute in general

terms, leaving to the executive considerable flexibility and discretion to determine the means of enforcement, even when that may entail interstitial and subsidiary policy choices *(see, Matter of Levine v Whalen,* 39 NY2d 510, 515-516; *Matter of Broidrick v Lindsay, supra,* at 646). But even where there has been an express delegation of authority, the executive branch may exceed its legitimate reach by engaging in broad policy making on controversial issues not foreseen or contemplated when the enabling legislation was enacted, in effect "[writing] on a clean slate * * * without benefit of legislative guidance" *(Boreali v Axelrod,* 71 NY2d 1, 13). Moreover, executive action under an express statutory delegation of authority still must be tested to determine whether it is consistent with legislative policy choices *(see, Matter of Campagna v Shaffer,* 73 NY2d 237, 242-243) or bears a reasonable relation to the purpose of the enabling legislation *(see, Matter of Di Brizzi [Proskauer],* 303 NY 206, 216).

In our view, the settlement arrangement for the acquisition and closing of Shoreham transgresses none of the foregoing separation of powers principles. First, quite clearly, the closing of Shoreham was a legislative objective of the Act. The crisis derived from excessive costs of electricity to LILCO's ratepayers, which the Act centrally addressed, and was found by the Legislature to have been primarily caused by LILCO's "imprudent" decisions, not only to start construction of Shoreham, but "thereafter to continue such construction" (Public Authorities Law § 1020-a). The Legislature found specifically that the economically crippling rate increases granted LILCO were due to Shoreham, and foresaw the likelihood of "further substantial rate increases if such plant is placed in service" (§ 1020-a). The Act expressly mandated the "forthwith" closing of Shoreham by LIPA upon its acquisition of either a controlling stockholder interest in LILCO or all of LILCO's property (Public Authorities Law § 1020-h [9]), and banned LIPA from operating a nuclear-powered facility in LILCO's service area *(see,* Public Authorities Law § 1020-t).

The legislative debates concerning the Act manifest the inalterable opposition to the operation of Shoreham by the Act's proponents. The primary Senate sponsor identified the Act's goal of solving three problems: *"The Shoreham nuclear plant problem * * *;* the rates themselves * * *; and Thirdly, the replacement of LILCO management with management that people will have confidence over" (Senate Floor Debates, 1986, at 7044, remarks of Senator Kenneth La Valle [empha-

sis supplied]). An overwhelming majority of his constituency, even higher than that in favor of replacing LILCO, opposed the opening of Shoreham. In the Assembly, the principal sponsor and drafter of the Act assured that body that the result of the bill would be that Shoreham would never operate as a nuclear-powered facility:

"Mr. Hoyt: * * * I really wanted to talk to you tonight about two things, as the chief sponsor of the bill. * * * Without getting into an ideological dispute about nuclear power versus other types of power, the fact is that this bill says that Shoreham will not open. Shoreham may have been a coal-fired plant or it might be a set of windmills or anything, but the point is it will not open.

"Mr. Harenberg: *Not as a nuclear plant anyway.*" (Assembly Floor Debates, July 1, 1986, at 375-376 [emphasis supplied].)

Thus, it cannot be said that the planned acquisition and closing of Shoreham by LIPA, as agreed to in the settlement, constituted the adoption of some new policy in the guise of remedial implementation of the Act *(cf., Under 21, Catholic Home Bur. for Dependent Children v City of New York, supra).* Nor was it the ostensible exercise of expressly delegated power to instead write new social policy regarding nuclear power plants on Long Island "on a clean slate" *(cf., Boreali v Axelrod, supra).*

Petitioners essentially argue that the acquisition and closing of Shoreham under the settlement arrangement exceed the powers delegated LIPA under the Act because (1) the arrangement does not also provide for or is not accompanied by LIPA's acquisition of LILCO's capital stock or remaining property to enable it to replace LILCO as the power utility for LILCO's service area, and (2) certain other obligations and understandings by various State agencies under the settlement arrangement would have the effect of bolstering LILCO as an operating entity, thereby conflicting with the legislative goal of a LILCO takeover. The first of these factors only becomes decisive, however, if the Act so completely tied the hands of LIPA as to make LIPA's acquisition of LILCO's assets or stock and the replacement of LILCO the *exclusive means by which the statutory objective of Shoreham's closure can be effected.*

As to the second factor—the perceived inconsistency with the Act of various provisions of the settlement arrangement tending to enhance LILCO's vitality as a public utility—it

appears to us that this only becomes fatal to the validity of the settlement arrangement if the Act is read to make the acquisition and replacement of LILCO so predominant a legislative objective as to totally restrict LIPA's discretion to pursue the goal of Shoreham's closing by means detrimental to a full LILCO takeover, even when such means may reasonably have been deemed necessary to achieve the goal of closure of Shoreham.

■ Thus, each of the factors cited as grounds for finding an unauthorized executive action here proceeds from a restrictive interpretation of the Act under which there is a definitive prioritization of purposes and a strict confinement of discretion of the executive agency charged with implementation of the legislation. None of this, in our view, is supported either by the statutory language or the legislative history. The Act sets forth no strict hierarchy of goals and is replete with broad grants of discretion to LIPA.

To begin with, although the Legislature in its findings and declarations clause *(see,* Public Authorities Law § 1020-a) found that supplanting LILCO by a public power authority was the "best" way of remedying the problems addressed by the Act, it did not stipulate that this method was to be exclusive or mandatory. To the contrary, the Act adopted an entirely flexible approach. Thus, LIPA was authorized to acquire by negotiation, tender offer or condemnation "all or *any part* of the securities or *assets* of LILCO" (Public Authorities Law § 1020-h [2] [emphasis supplied]). Moreover, the decision to thus acquire and the extent thereof was to be made "as [LIPA] in its *sole discretion* may determine" (§ 1020-h [2] [emphasis supplied]). LIPA was also given the power "to determine the * * * *acquisition,* use and *operation* of any generating * * * facility" (Public Authorities Law § 1020-g [c] [emphasis supplied]).

As the foregoing provisions demonstrate, LIPA's option *not* to acquire and fully take over LILCO always remained open. Only a decision *to* acquire all or any part of the utility was made contingent, i.e., dependent upon a determination that it would result in rates to LILCO's customers not higher than LILCO would have charged had there been no takeover *(see,* Public Authorities Law § 1020-h [2], [4], [10]). That determination was again, however, to be made "in [LIPA's] *sole discretion* based upon such engineering, financial and legal data, studies and opinions as *it may deem appropriate"* (Public Authorities Law § 1020-h [2] [emphasis supplied]). And, the

Act also generally endowed LIPA with "all of the powers necessary or convenient" to implement the multiple purposes of the Act (Public Authorities Law § 1020-f) and provided for liberal construction of its terms to effectuate such purposes *(see,* Public Authorities Law § 1020-ff). One would be hard pressed to find language more clearly conveying legislative intent to give the implementing agency the broadest flexibility in administering the statute, including the discretion *not* to proceed with a full LILCO takeover.

Against this array of language granting LIPA broad discretion, the principal statutory provision relied upon by petitioners to support their contrary, restrictive interpretation is Public Authorities Law § 1020-h (9), mandating LIPA's closing of Shoreham "after [LIPA] has acquired sufficient shares of LILCO stock to do so or after it has acquired all the property of LILCO". Their argument draws the negative implication from this imposed duty to close Shoreham upon LIPA's full acquisition that LIPA was intentionally denied power to close Shoreham absent a complete LILCO takeover. But inferences by negative implication have been found a weak interpretive reed for confining an executive agency's authority when the enabling statute expressly grants the agency broad discretion to implement the legislative goals. For example, in *Matter of City of New York v State of N. Y. Commn. on Cable Tel.* (47 NY2d 89, 92), the Court of Appeals found "neither compelling nor convincing" the petitioner's argument that, because the provisions of the respondent commission's enabling act "seem to contemplate approval or disapproval of an *entire* [cable television franchise] amendment application * * * the commission is prohibited from singling out for disapproval one of a number of amendments grouped together in the same application" (emphasis supplied). The court based its rejection of such negative implication on the provisions of the subject legislation giving that commission broad regulatory authority, particularly the explicit grant of " 'all other powers necessary or appropriate to carry out the purposes' of the enabling act" *(supra,* at 92), a clause virtually identical to the general grant of authority to LIPA under Public Authorities Law § 1020-f. Indeed, even without an express statutory delegation of implementating authority, the Court of Appeals majority in *Clark v Cuomo* (66 NY2d 185) rejected the dissent's inference that the specific directions in the Election Law to the State Board of Elections and to County Boards of Elections to encourage voter registration and to widely distribute voter registration

application forms "represent a legislative policy to designate the bipartisan Boards of Election the *exclusive* official instruments for distributing registration materials" *(supra,* at 194 [Jasen, J., dissenting] [emphasis supplied]). The majority repeated its recognition that the executive is generally granted great flexibility in determining the method of enforcing legislation and only offends separation of powers "when [it] acts inconsistently with the Legislature, or usurps its prerogatives" *(supra,* at 189).

■ We find nothing in the legislative debates that makes the acquisition and closing of Shoreham totally contingent upon LIPA's full acquisition and replacement of LILCO. As previously described, the legislators clearly intended that the closing of Shoreham would be effected under the Act. The creation of LIPA as a public power authority and the closing of Shoreham were recognized as dual purposes of the Act. As a cosponsor in the Assembly noted, "[t]his is significant, not only for the fact that it [the Act] creates a Long Island Public Power Authority, but because it decommissions that financial fiasco known as Shoreham, and it says the plant will not operate" (Assembly Floor Debates, July 1, 1986, at 392, remarks of Assemblyman Lewis Yevoli). On the other hand, the legislators were well aware that the conditions placed in the LIPA bill which were to be fulfilled before full acquisition could take place might very well forestall or at least create a delay of years before any actual replacement of LILCO was achieved. Thus, one supporter of the Act stated, "[w]ill it become a reality? Well, obviously, that's going to depend. It will depend on those prohibiting factors that have now been put into the LIPA bill at the request of the Governor" (Senate Floor Debates, 1986, at 7059-7060, remarks of Senator James Lack). A second supporter, Senator Olga Mendez, similarly stated, "[b]y the time this plan goes into effect which I suppose would be five to ten years, it might not even go into effect because there are so many ifs and buts within the bill that would make that a reality" (Senate Floor Debates, 1986, at 7082-7083). In view of the implacable executive and legislative opposition to the placing of Shoreham in full operation, it is inconceivable that the Act's proponents intended to restrict LIPA's statutory authority to block the operation of Shoreham by making that authority contingent upon another event (LIPA's replacement of LILCO), which they were fully aware might never take place. Rather, the full takeover of LILCO was the contingent goal under the Act and, as such, cannot so

predominate over the other legislative objectives, as petitioners' position necessarily implies.

In short, the statutory language contained in the Act is amply sufficient to establish that LIPA was broadly delegated flexible implementing and subordinate policy-making powers to decide upon the means and timing of accomplishing the legislative goal of the acquisition and closing of Shoreham, and whether to coordinate it with the replacement, if any, of LILCO as the provider of electrical power in its service territory *(see, Matter of Nicholas v Kahn,* 47 NY2d 24, 31-33; *Matter of Bates v Toia,* 45 NY2d 460, 464-465).

Moreover, the exercise of those delegated powers was rational and proper upon a fair and realistic assessment of the then existing circumstances. The State by then had failed before the NRC in its attempt to achieve a veto of the licensing of Shoreham simply by refusing to join with LILCO in fashioning an emergency evacuation plan *(see, Cuomo v Long Is. Light. Co.,* 71 NY2d 349, 353, *supra).* Full-power licensure of Shoreham appeared to be imminent and, in fact, Shoreham received that license from the NRC in late April 1989 *(see, Matter of Long Is. Light. Co. [Shoreham Nuclear Power Stat., Unit 1],* 29 NRC 211, *supra).* LILCO's challenge to the constitutionality of the Act's provisions dictating the method of evaluating LILCO's assets in general, and of Shoreham in particular, upon condemnation *(see,* Public Authorities Law § 1020-h [1] [f]-[m]) had not been finally resolved *(see, Long Is. Light. Co. v Cuomo,* 666 F Supp 370, *appeal dismissed and vacated in part* [after and pursuant to the settlement arrangement] 888 F2d 230, *supra).* The cost of acquiring Shoreham (and LILCO) could also be expected to rise substantially once that facility was placed in full operation. LIPA only proceeded with the acquisition of Shoreham after receiving a comprehensive study report indicating that LILCO's rates under the terms of the settlement arrangement, with Shoreham closed, would be less than with Shoreham open *(see,* Public Authorities Law § 1020-h [2]). Moreover, nothing in the settlement prevented LIPA from subsequently deciding to acquire and replace LILCO, LILCO's only remedy therefor being restoration to its position in and ability to prosecute the court challenges to the Act which were discontinued under the settlement arrangement.

Based upon the foregoing, the settlement arrangement bears a reasonable relationship to the goals of the Act and, indeed, may well represent the maximum possible attainment

of those goals in the state of affairs at the time. The settlement arrangement, therefore, did not transgress the constitutional separation of powers by invading the policy-making domain of the Legislature, a conclusion confirmed by the Legislature's subsequent appropriation of funds for LIPA *(see, Brooks v Dewar,* 313 US 354, 361).

### B. SEQRA

■ The most serious alternative challenge to the settlement arrangement is that of petitioners, including intervenor, in proceeding No. 2 in contending that the settlement arrangement violated SEQRA. Specifically, they claim that an EIS was required (1) of the Governor and LIPA before entering into agreements with LILCO for the transfer of Shoreham to LIPA followed by the closing and decommissioning of the facility, (2) of PASNY before entering into the agreements pursuant to which it undertook to perform the decommissioning of Shoreham and to build fossil fuel generating plants on Long Island, at LILCO's request, to replace the potential generating capacity lost by the abandonment of the Shoreham project, and (3) of the PSC before it approved of the settlement arrangement and an attendant rate moderation plan granting LILCO two definite 5% rate increases in 1989 and 1990 and further annual projected rate increases of 4.6% through 1999. We find these contentions also unpersuasive.

Undoubtedly, as these petitioners and intervenor demonstrate, there will be highly significant environmental effects from the ultimate decommissioning of Shoreham and the possible replacement of its generating capacity by other non-nuclear facilities. However, the decisions actually involved in the settlement arrangement are either statutorily exempt from SEQRA, or so tentative and premature as not yet to trigger SEQRA review. The decision to transfer Shoreham to LIPA contemplates LIPA's acquisition of a LILCO asset. The Act specifically provides that SEQRA "shall not be applicable *in any respect* to such acquisition" (Public Authorities Law § 1020-s [2] [emphasis supplied]). Hence, the agreement to transfer and all approvals thereof by various agencies were statutorily exempt. The decision to close and decommission Shoreham once acquired by LIPA was also exempt. LIPA was prohibited under the Act from operating any nuclear-powered facility in LILCO's service area *(see,* Public Authorities Law § 1020-t). Moreover, as already described, LIPA was mandated to close and decommission Shoreham once it had the power to do so by acquiring shares of LILCO stock or all of LILCO's

property *(see,* Public Authorities Law § 1020-h [9]). Although these provisions could have been more artfully drawn, they clearly were intended to mandate the closure of Shoreham as a nuclear facility upon acquisition by LIPA, and that intent is confirmed by the legislative history previously cited. Therefore, LIPA would have no choice but to close and decommission Shoreham once it was acquired, and the nondiscretionary undertaking to do so in the settlement arrangement was excluded from being an "action" requiring review under SEQRA *(see,* ECL 8-0105 [5] [ii]; *Matter of Queensbury Assn. v Town Bd.,* 141 AD2d 997, 999).

These parties may well be correct that the decisions to acquire and close Shoreham are of the type generally requiring review under SEQRA, by committing the State and LIPA to a course of environmentally significant action and foreclosing nuclear-powered operation of Shoreham as an alternative action which might be more environmentally sound than closure and replacement of Shoreham by fossil fuel plants. The short answer is that, under the statutory provisions cited, the Legislature preempted the policy decision-making and balancing of ecological/social/economic costs and benefits of the SEQRA process as to the fundamental decisions to acquire and close Shoreham.

■ There is nothing in the record to indicate that formulation of any concrete plan of decommissioning the Shoreham facility by PASNY had yet been achieved. Also, the memorandum of understanding concerning PASNY's possible construction of alternative generating facilities contains so many significant independent conditions that PASNY's undertaking in this regard is at most contingent and provisional. Therefore, PASNY's proposed actions as to both decommissioning Shoreham and constructing alternative facilities have not yet reached the stage where SEQRA review is required *(see, Matter of Programming & Sys. v New York State Urban Dev. Corp.,* 61 NY2d 738, 739; *Matter of Stewart Park & Reserve Coalition v New York State Dept. of Transp.,* 157 AD2d 1, 11). The final objection on SEQRA grounds relates to the PSC's approval of LILCO's rate moderation plan without an EIS. There is no authority for requiring SEQRA review of rate decisions by the PSC. The PSC's SEQRA regulations characterize that agency's actions relating to utility tariff schedules as Type II actions under SEQRA *(see,* 16 NYCRR 7.2 [b] [2] [ii]). It was not unreasonable for the PSC to conclude that the rate moderation plan approval fell under that regulatory

provision as a Type II action. SEQRA review, thus, was not required *(see,* 6 NYCRR 617.13 [a]).

### C. AUTHORITY OF PASNY

■ We also reject petitioners' contention that PASNY's statutory powers were exceeded by its undertakings in the settlement arrangement with respect to performing the actual decommissioning of Shoreham and the possible construction of other generating facilities for LILCO. The decommissioning agreement between PASNY and LIPA was a reasonable application of the statutory authority granted LIPA to enter into contracts with other State agencies "necessary or convenient" in implementing the Act and the concomitant authorization granted all State agencies "to enter into and do all things necessary to perform any such agreement" (Public Authorities Law § 1020-f [h]). PASNY's general power to perform the decommissioning of nuclear facilities has also been expressly acknowledged by the Legislature *(see,* Public Authorities Law § 1005-a). The memorandum of understanding between PASNY and LILCO refers only to the possibility of PASNY constructing *baseload* generating facilities for LILCO and, therefore, is also consistent with PASNY's statutory authority *(see,* Public Authorities Law §§ 1001, 1005 [8] [b]).

### D. OPEN MEETINGS LAW AND OTHER MATTERS

■ We reject petitioners' claim that the actions of LIPA and PASNY in approving the settlement arrangement must fall because the public notice requirements of the Open Meetings Law (Public Officers Law art 7) were not satisfied. Our review of the record shows that the respective agencies properly posted public notices and made timely press releases to appropriate newspapers. Petitioners have failed to substantiate their claim. After reviewing the remaining contentions of the various petitioners, we find them also to be without merit and not requiring extended discussion.

## VI. CONCLUSION

Based on the reasons expressed, we affirm Supreme Court's judgment in *Matter of Citizens For An Orderly Energy Policy v Cuomo* and confirm respondents' determinations in *Matter of Dollard v Long Is. Power Auth.* In reaching this conclusion we are cognizant of the disparate views of the respective parties regarding nuclear power and Shoreham. Our decision is not meant to be a judgment on any party's position regarding nuclear-generated power generally or Shoreham specifically. It

is simply an assessment of the authority granted by the Legislature and how that authority has been exercised. As a court charged with resolving the matters before us, our role ends there.

MAHONEY, P. J., CASEY, WEISS, LEVINE and HARVEY, JJ., concur.

Proceeding No. 1—Judgment affirmed, without costs.

Proceeding No. 2—Determinations confirmed, and petitions dismissed, without costs.