OPINION OF THE COURT
Bellacosa, J.
The fundamental fulcrum of this case is the validity of the February 1989 "Settlement Agreement”, providing essentially for the Long Island Power Authority (LIPA) to acquire the Long Island Lighting Company’s (LILCO) Shoreham Nuclear Plant and to close that plant. We affirm the lower courts’ determinations unanimously upholding the Agreement against a host of challenges.
I. SHOREHAM
LILCO’s nuclear reactor power plant, sited on Long Island Sound in the Shoreham community of the Town of Brookhaven, Suffolk County, was conceived in 1965 as a 540 megawatt nuclear operation to be built at a cost of $124 million. LILCO’s original objective was to provide better and reasonable power service to over three million people and industries in its huge *407 suburban service area. The existing plant, enlarged to 809 megawatts, was substantially completed in 1984 at a mushroomed cost of $5.5 billion, with carrying costs of approximately $30 million a month. Persistent and complex problems plagued this titanic project for almost three decades. Among the problems were varied concerns of this nature: regulatory, licensing, legal, multijudicial, financing, safety, labor/management, consumer, national/State/local political, and providing a reasonable/adequate power supply. Two major events provide historical context as well: the 1979 accident at the Three Mile Island Nuclear Power Station in Pennsylvania and the 1986 accident at Chernobyl in the Soviet Union.
II. upa act — POUCY
To try to solve the chain of impasses and crises, the Governor and the Legislature negotiated and produced the LIPA Act (the Act) in 1986 (L 1986, ch 517). The legislative findings specifically state that LILCO’s decisions to commence and continue construction of Shoreham were "imprudent” and created "significant rate increases” which have resulted in "excessive” electricity costs to LILCO’s service area customers (Public Authorities Law § 1020-a). The Legislature questioned whether Shoreham would ever operate or be capable of providing "sufficient, reliable and economic electric service” if it were to operate (Public Authorities Law § 1020-a; see, § 1020-h [1] [g]). The Legislature declared in the Act that this crisis created "a situation [of State concern] threatening the economy, health and safety * * * in the service area” (Public Authorities Law § 1020-a).
III. THE UPA ACT
The Act created LIPA, a not-for-profit public corporation, to implement the Legislature’s multiple objectives and policies (Public Authorities Law § 1020-c [1]). It conferred broad authority and power on LIPA to fulfill the primary statutory objectives: closing Shoreham, replacing LILCO as the provider of electric and gas power on Long Island, reducing power costs, or all of these (Public Authorities Law §§ 1020-f, 1020-g, 1020-h). The Act authorized LIPA to acquire "all or any part” of LILCO’s securities or assets — including, of course, Shore-ham — to further the legislative findings "as [LIPA] in its sole discretion may determine” providing that prior to "any such acquisition” LIPA determines that higher utility rates will not *408 result (Public Authorities Law § 1020-h [2] [emphasis added]). LIPA is authorized to acquire LILCO’s securities or assets through negotiated instrument, tender offer or eminent domain (Public Authorities Law § 1020-h). The Act mandated that LIPA close and decommission Shoreham "forthwith” upon acquisition and consider possible alternative uses (Public Authorities Law § 1020-h [9]). It expressly prohibited LIPA from operating a nuclear power facility (Public Authorities Law § 1020-t), and gave LIPA the power "to determine the location, type, size, construction, lease, purchase, ownership, acquisition, use and operation of any generating, transmission or other related facility” (Public Authorities Law § 1020-g [c]).
Under the Act, LIPA is authorized to make and execute agreements and contracts "necessary or convenient in the exercise of [its] powers and functions” (Public Authorities Law § 1020-f [h]) and all State agencies are authorized "to enter into and do all things necessary to perform any such agreement” (Public Authorities Law § 1020-f [h]).
IV. THE 1989 SETTLEMENT AGREEMENT
After an unsuccessful effort in 1988 to reach agreement resolving the Shoreham crisis, and after an unsuccessful tender offer by LIPA to acquire LILCO (see, Public Authorities Law § 1020-h [3]), LILCO and the Governor signed the 1989 Settlement Agreement at issue in this case. The Agreement provided that LILCO would transfer the Shoreham plant to LIPA for $1 and LILCO would pay for all costs associated with Shoreham, pursuant to an "asset transfer agreement” incorporated in the Agreement. The Agreement provided that LIPA would contract with the Power Authority of the State of New York (PASNY) for the technical expertise necessary to close Shoreham. This was in furtherance of the legislative objective of closing Shoreham "forthwith” (Public Authorities Law §§ 1020-a, 1020-h [9]). The Agreement reflected the intent that LILCO be returned to an investment-grade financial condition as an investor-owned electric and gas company, and provided for LIPA to advise LILCO in developing a comprehensive least-cost power supply. PASNY agreed to construct additional power-generating facilities for LILCO if requested. The Agreement noted the Public Service Commission’s (PSC) approval of a temporary LILCO rate increase for that rate year and expressed the understanding that LILCO’s subsequent rate increases would be minimal. It provided for settlement of *409 related litigation, including LILCO’s appeal to the Second Circuit Court of Appeals from a declaration that the Act was constitutional (Long Is. Light. Co. v Cuomo, 666 F Supp 370, appeal dismissed and judgment vacated 888 F2d 230). LILCO retained the right to seek reinstatement of its Federal court appeal in the event LIPA exercised its statutory authority to acquire LILCO — still a viable, statutory authorization not precluded by the Agreement.
The 1989 Agreement was buttressed by an independent study, commissioned by LIPA, which demonstrated that LIL-CO’s rates, freed of the Shoreham albatross, would be cheaper than LILCO’s rates with Shoreham, thus satisfying the only condition legislatively imposed on LIPA’s authority to acquire "all or any part of’ LILCO’s assets (see, Public Authorities Law § 1020-h [2]). The Agreement was subsequently evaluated and approved as required by the PSC, LIPA, PASNY and LILCO.
Petitioners, representing individuals, business groups and interest groups, commenced three separate CPLR article 78 proceedings challenging the execution and approval of this Settlement Agreement on various grounds.
We conclude that the essential rationale of the Per Curiam opinion at the Appellate Division (159 AD2d 141) dealing with LIPA’s authority and SEQRA is sound. Its core conclusion bears emphasis: "[o]ne would be hard pressed to find language more clearly conveying legislative intent to give the implementing agency the broadest flexibility in administering the statute, including the discretion not to proceed with a full LILCO takeover” (159 AD2d, at 156 [emphasis added]). We also affirm and agree with the result and reasoning of the second determination brought up for our review and reflected in the Per Curiam opinion at 163 AD2d 700.
The Citizens for an Orderly Energy Policy and the Dollard petitioners contend that the Settlement Agreement contravenes the LIPA Act, subverts its legislative policy, violates the constitutional principle of the separation of powers, and leaps beyond the scope of statutory authority of the respondent Governor and executive agencies. Specifically, petitioners argue — and the dissenters agree — that LIPA is required to acquire LILCO itself before it may acquire and close Shoreham. They claim that respondents exceeded their statutory authority by making a Settlement Agreement which provides for Shoreham’s closure independent of LIPA’s replacement of *410 LILCO so that Long Island’s power needs would be supplied only by a public power source.
These arguments, presented at considerable length and with complexity and sophistication, may be simplified for this part of our analysis. They proceed from the erroneous supposition that the exclusive or paramount objective of the LIPA Act was the acquisition and displacement of LILCO itself as a privately owned investor company supplying electric and gas utility services to Long Island. We conclude that the statute nowhere limits the Executive Branch and its agencies in this critical respect. Instead, the respondents acted within their respective constitutional and statutory authority and effected a properly delegated discretionary policy and purpose articulated and intended by the LIPA Act, i.e., the closure and decommissioning of Shoreham by LIPA.
V. STATUTORY AUTHORIZATION FOR CLOSING SHOREHAM
The Executive Branch and its agencies may not "go beyond stated legislative policy and prescribe a remedial device not embraced by the policy” in contravention of the separation of powers doctrine (Matter of Broidrick v Lindsay, 39 NY2d 641, 645-646). However, only executive acts inconsistent with or arrogative of the Legislature’s prerogatives violate the separation doctrine (Clark v Cuomo, 66 NY2d 185, 189; Matter of Nicholas v Kahn, 47 NY2d 24, 30; Rapp v Carey, 44 NY2d 157, 163; Matter of Broidrick v Lindsay, supra, at 645-646). A check-and-balance in the distribution of powers is that the Legislative Branch may not delegate away its fundamental lawmaking powers or policymaking choices. The Legislature may, however, declare its policy in general terms by statute, endow administrative agencies with the power and flexibility to fill in details and interstices and to make subsidiary policy choices consistent with the enabling legislation (Boreali v Axelrod, 71 NY2d 1, 10; Matter of Nicholas v Kahn, supra, at 31; Matter of Bates v Toia, 45 NY2d 460, 464).
The Legislature is not required in its enactments to supply agencies with rigid marching orders, especially in a field as complex as nuclear power regulation, which is "simply incapable of statutory completion” and "where flexibility in the adaptation of the legislative policy to infinitely variable conditions constitute[s] the very essence [of the Act]” (Matter of Nicholas v Kahn, 47 NY2d 24, 31, supra). The intricate nuances of the policy determinations required under the LIPA *411 Act deserve some respect from the Court. The specialized entity, LIPA, was created by the Legislature to concentrate on and resolve these matters within a reasonably defined and delegated range of expertise (see, Matter of Memorial Hosp. v Axelrod, 68 NY2d 958, 960; Matter of Great Lakes-Dunbar-Rochester v State Tax Commn., 65 NY2d 339, 343). The wisdom and prudence of the Legislature’s flexible approach are not ours to question. Nor may the Court weigh the fiscal quid pro quos of the Settlement Agreement. Our role is simply to construe the enactment, its validity and its implementation.
There can be little doubt that the Act authorizes LIPA to acquire and close Shoreham. It allows LIPA to acquire "all or any part of the securities or assets of LILCO, as the authority in its sole discretion may determine” (Public Authorities Law § 1020-h [2] [emphasis added]; see also, § 1020-f [d]; § 1020-g [c]; § 1020-h [6] [a]). The Legislature wanted Shoreham closed and decommissioned, and it expressly declared its legislative policy that LIPA’s acquisition, closure and decommissioning of Shoreham would accomplish an objective of the Act (Public Authorities Law §§ 1020-a, 1020-h [9]; § 1020-t; cf., Matter of Campagna v Shaffer, 73 NY2d 237, 243; Boreali v Axelrod, 71 NY2d 1, 6, 11-16, supra; Under 21, Catholic Home Bur. for Dependent Children v City of New York, 65 NY2d 344, 356; Subcontractors Trade Assn. v Koch, 62 NY2d 422, 429-430; Matter of Broidrick v Lindsay, 39 NY2d 641, 646-647, supra).
In fact, closure of Shoreham was one of the overriding engines driving the emergency legislative initiative and package. The language of the Act and its legislative history cogently portray the Act’s objectives: LIPA’s acquisition and closure of Shoreham, or LIPA’s takeover and replacement of LILCO as a utility provider, or both, dependent only on control of rates (see, Public Authorities Law §§ 1020-a, 1020-h). The objectives were not expressed as mandatory or paramount or indispensably linked or preconditioned upon each other. Thus, respondents cannot be said to have arrogated by administrative or executive fiat that which was not contemplated or delegated by the Legislature (Matter of Campagna v Shaffer, 73 NY2d 237, 242, supra), and did not "effect [their own] vision of societal policy choices” (id., at 242) or act on a "clean slate”, thereby invading the nondelegable legislative policy-making function (Boreali v Axelrod, 71 NY2d 1, 13, supra). To be sure, this Settlement Agreement did not, by any stretch of the facts, result from executive fiat; rather, it was the product of a constitutional and statutorily authorized resolution of the *412 Shoreham crisis by LIPA, LILCO and the Governor and executive agencies (contrast, Youngstown Co. v Sawyer, 343 US 579 [a totally inapposite case, cited by the dissenters at 428-429, whose essential facts are the seizure of the country’s steel mills unilaterally by President Truman to deal with a strike during the Korean War]).
Appellants and the dissenters would have the Court construe the comprehensive statute (Public Authorities Law § 1020-h [9]) in a strained and inflexible fashion, producing absurd results. Their legislatively unintended all-or-nothing approach would reinstate the Shoreham crisis, producing a plain contradiction of a critical objective of the statute.
The Act conferred broad discretion on LIPA, delegated to it "all of the powers necessary or convenient” to implement its multipronged, complicated purposes (Public Authorities Law § 1020-f), and provided for liberal construction of its terms to effectuate its purposes (Public Authorities Law § 1020-ff). Appellants’ and the dissenters’ interpretation, relying on an inference by negative implication that the Public Authorities Law withholds authority from LIPA to close Shoreham, unless it completely takes over LILCO, is simply wrong. The pertinent subdivisions, the strained cross-incorporation by reference of general preamble language, and the Act overall do not impose or create such a requirement. Further, the negative inference approach is a disfavored interpretive tool, especially in the face of a broad delegation of appropriate discretion and authority designed to effect the stated legislative goals of closure, found throughout the whole Act read as an integrated, complex, emergency package of legislation (see, Matter of City of New York v State of New York Commn. on Cable Tel., 47 NY2d 89, 92; see also, Clark v Cuomo, 66 NY2d 185, supra). Indeed, none of the legislative history on which the dissenters rely supports their judicial incorporation into the Act of a conditional restriction that LIPA was without authority to acquire Shoreham in a negotiated agreement unless it simultaneously engaged in a full scale buyout and replacement of LILCO.
The only condition attached to LIPA’s decision to acquire any or all of the assets or stock of LILCO is LIPA’s determination that such acquisition would result in rates to LILCO’s customers not higher than LILCO would have charged had there been no such acquisition (Public Authorities Law § 1020-h [2], [4], [10]). Once that threshold is satisfied, LIPA is *413 empowered — but not required — to make any such acquisition. No provision can be found anywhere in the Act which expressly or by reasonable implication requires that LIPA must exert its full acquisition authority contemporaneously with the acquisition and decommissioning of Shoreham itself, i.e., "making LIPA’s authority to acquire any part of the LILCO property conditional on LIPA’s replacing LILCO” (dissenting opn, at 418; see also, 419, 420, 424-425, 427-428). No matter how many times or different ways such an unfounded interpretation is repeated, the fact remains that the Act simply does not "condition” LIPA’s acquisition of Shoreham on its acquisition also of all of LILCO’s assets and replacement of privately owned LILCO with a public utility provider. One would, in any event, expect a critical precondition feature of this kind to be expressed or readily ascertainable if it were ever intended. It is not, and that is not surprising, for that could have paralyzed LIPA from bringing about a plainly intended goal: the closing of Shoreham.
Appellants claim that the Agreement, because it provided for the continued operation of LILCO, conflicts with the legislative goal to put LILCO out of business by a takeover and substitution with a public power supplier. While the Legislature indicated in the Act that it contemplated — based on information and conditions at the time of enactment — that replacement of LILCO with a publicly owned power authority would be the "best” or "most appropriate” method of remedying the host of emergency problems addressed by the Act (especially closing Shoreham) (see, Public Authorities Law §§ 1020-a, 1020-h [1] [a], [n]), the Legislature reposed in LIPA the flexible authority to make the ultimate choice among statutory alternatives. LIPA was authorized to acquire all or any part of LILCO’s stock and assets (Public Authorities Law § 1020-h), but the Act does not mandate or direct LIPA to do so or to replace LILCO at any given time or as a precondition to achieving other key legislative objectives.
Acquisition of all of privately owned LILCO’s assets by eminent domain or otherwise would cost billions of taxpayer dollars (hardly a "bail out” [dissenting opn, at 418]); this is a factor the Legislature recognized in affording LIPA broad authority with respect to whether such a total acquisition was feasible, or necessary, or might contribute to higher rather than lower rates because of the financing costs alone of such a monumental public acquisition of a privately owned utility (Bill Jacket, L 1986, ch 517, Budget Report on Bills, at 7; id., *414 Report of Comptroller, at 19). We emphasize that the recurring and unavoidable theme reflected in the legislative history is that the intended sine qua non objective of the Act was to give LIPA the authority to save ratepayers money by controlling and reducing utility costs (Bill Jacket, Assembly Mem, at 14; id., Budget Report, at 6; id., Executive Approval Mem, at 12; id., Executive Mem, at 15). It was not to force LIPA to replace LILCO as the service area utility provider in order to achieve the legislative objective of closure of Shoreham and elimination of Shoreham’s impact on utility rates.
Indeed, the Governor, in approving the LIPA Act legislation, emphasized that the core objective of the Act was to produce ratepayer savings, which he recognized might not necessarily be achieved by a complete conversion to public power through LIPA’s replacement of LILCO (Governor’s Approval Mem, 1986 McKinney’s Session Laws of NY, at 3178).
Further, under the terms of the Agreement, LIPA did not permanently forego the exercise at some time of its delegated power to acquire and supplant LILCO should it decide in its "sole discretion” that doing so would accomplish the Act’s objective of controlling utility costs to LILCO customers (see, Public Authorities Law § 1020-h [2]). The Agreement is not structured to expressly prohibit acquisition by LIPA of any part of LILCO other than Shoreham, as the Agreement in no way precludes LIPA from exercising its full range of statutory choices under the LIPA Act depending on the time and circumstances, including market conditions and the State’s fiscal situation. Rather, the Agreement plainly accomplished an urgent objective of the Act: the prevention of further rate increases attributable to the Shoreham enterprise.
We emphasize that our decision in this respect focuses solely on the statutory interpretation concerning the delegation, implementation and distribution of governmental public utility power as it pertains to Shoreham. We imply no views— which would be irrelevant and inappropriate in any event— about the wisdom of nuclear power, public power, or punishment of private power companies for failed and costly enterprises. We conclude only that a rational choice was made by the entities charged with the implementing authority — legitimate "means” — based on delegated power and on the record before us to achieve a legislative goal — the legitimate "end” of Shoreham (dissenting opn, at 428).
*415 VI. SEQRA
The Dollard petitioners and the intervener United States Department of Energy argue that the Settlement Agreement violates SEQRA. Specifically, they contend that the Governor and administrative agencies had to produce Environmental Impact Statements (EIS) before making or approving this Agreement with LILCO to transfer Shoreham to LIPA for closure and decommissioning. They add that PASNY also had to do a SEQRA review before it agreed to aid LIPA in decommissioning Shoreham by building baseload generating plants for LILCO in the future, if LILCO requested. We agree with the Appellate Division that, as to each aspect of this SEQRA argument, the Settlement Agreement was "either statutorily exempt from SEQRA, or so tentative and premature as not yet to trigger SEQRA review” (159 AD2d 141, 159).
Primary guidance is found in the LIPA Act, which declares that LIPA’s acquisition of LILCO’s assets or stock is not State "action” subject to SEQRA, and that SEQRA "shall not be applicable in any respect to such acquisition or any action of [LIPA] to effect such acquisition.” (Public Authorities Law § 1020-s [2].) Nothing in this respect could be plainer.
Appellants and the dissenters, with entirely inapposite authorities, nevertheless urge that the decision to decommission triggered an immediate full-scale SEQRA prerequisite to the Settlement Agreement itself. "[O]fficial acts of a ministerial nature, involving no exercise of discretion”, are expressly exempt from SEQRA (ECL 8-0105 [5] [ii]). A "ministerial act” is an action performed "in a prescribed manner imposed by law without the exercise of any judgment or discretion as to the propriety of the act” (6 NYCRR 617.2 [x] [emphasis added]). Actions of the State Legislature are also exempt (6 NYCRR 617.2 [q] [5]). When it passed the LIPA Act, the Legislature— inescapably aware of the inherent environmental consequences of Shoreham’s shutdown — necessarily judged for itself the propriety of closure and decommissioning and mandated such action (Public Authorities Law §§ 1020-a, 1020-h [9]). LIPA’s decision to fulfill the legislative objective to close and decommission Shoreham was not an action subject to SEQRA because LIPA had no choice in this respect; its acquisition of Shoreham triggered a legislatively mandated, ministerial consequence, i.e., to shut it down forthwith.
Appellants argue that decommissioning was not mandatory on these facts and, thus, is not entitled to the ministerial *416 exemption provision as that highly specialized legal word of art is employed in the SEQRA field. They essentially argue that under Public Authorities Law § 1020-h (9), LIPA’s closure and decommissioning of Shoreham were mandatory only if LIPA acquired controlling shares of LILCO or all of LILCO’s assets — but not if it just acquired Shoreham. This interpretation is not supported by legislation or logic. First, whether or not LIPA acquired, in addition to Shoreham, the rest of LILCO’s stock or remaining assets has no greater or lesser bearing on the potential for environmental consequences arising out of LIPA’s acquisition of only the Shoreham asset. Thus, it is not rational to differentiate between the two scenarios. The statute does not do so, and to do so by statutory construction leads to an unacceptable anomaly. The lesser circumstance could not rationally be subject to more severe restrictions than the greater.
Second, the Legislature allowed LIPA to acquire Shoreham only, expressed that decommissioning was a central objective of the Act, precluded LIPA from running Shoreham, and certainly understood and intended that if LIPA acquired Shoreham it must "forthwith” close and decommission it. "Forthwith” in this circumstance would surely be an oxymoronic usage if the Legislature were deemed to have compelled the SEQRA process in this circumstance only, because that would freeze the shutdown and decommissioning process.
Viewed in another light, appellants’ restrictive interpretation would compel this syllogism: if LIPA determined that acquisition of LILCO itself would not effect the Act’s objectives but that acquisition of Shoreham only would, LIPA must nevertheless choose the total takeover route to avoid SEQRA review of the lesser, common objective. Such a trap makes no sense and could not have been intended.
We emphasize that what was "ministerial” here was LIPA’s nondiscretionary action in complying with the Legislature’s mandate that Shoreham be decommissioned. It was not up to LIPA to produce an EIS to evaluate the propriety of the legislative policy choice of decommissioning because, in this case, mandating SEQRA review would have the effect of overriding the Legislature’s express exemption (6 NYCRR 617.2 [q] [5]).
Finally, we agree with the Appellate Division determination that PASNY’s agreement to aid LIPA in decommissioning and constructing alternative generating facilities for LILCO, if *417 requested, are proposed actions which had not reached the point at which SEQRA review is required at the time the Agreement was made (159 AD2d 141, 160, supra; see, Matter of Programming & Sys. v New York State Urban Dev. Corp., 61 NY2d 738, 739; Matter of Tri-County Taxpayers Assn. v Town Bd., 55 NY2d 41, 46-47). No decommissioning plan had been proposed or selected; no plans to build generating plants to replace Shoreham had been proposed or formulated; and no decision even to build such plants had been made. The subsequent selection of a specific decommissioning method has already received full environmental review, culminating in a Final Generic Environmental Impact Statement in 1990, which has not been challenged by appellants. PASNY’s construction of facilities — if ever undertaken — will be subject to independent SEQRA review when a specific project plan is actually formulated and proposed.
All other arguments, including those addressed to whether the PSC satisfied the requirements of the State Administrative Procedure Act, have been reviewed and require no further discussion, as they are without merit or affect on the dispositive analysis or result, or have been addressed in the Per Curiam opinions of the Appellate Division with which we agree.
Accordingly, in Matter of Citizens, the order of the Appellate Division should be affirmed, with costs. In Matter of Dollard and in Matter of Nassau Suffolk Contr.’s Assn., the judgments should be affirmed, with costs.