78 N.Y.2d 398 (1991)
In the Matter of Citizens for an Orderly Energy Policy, Inc., et al., Appellants,
v.
Mario M. Cuomo, as Governor of the State of New York, et al., Respondents, and Public Service Commission of the State of New York, Intervenor-Respondent. (Proceeding No. 1.)
In the Matter of J. Kenneth Dollard et al., Appellants, and United States of America, Intervenor-Appellant,
v.
Long Island Power Authority et al., Respondents. (Proceeding No. 2.)
In the Matter of Nassau Suffolk Contractor's Association, Inc., et al., Appellants,
v.
Public Service Commission of the State of New York et al., Respondents. (Proceeding No. 3.)
Court of Appeals of the State of New York.
Argued September 11, 1991.
Decided October 22, 1991.
J. Scott Greer and Lou Lewis for appellants in proceeding No. 1.
Martin S. Kaufman, Douglas Foster and Malcolm Wilson for appellants in proceeding No. 2.
Lou Lewis, Michael J. Englert and Kenneth F. Peshkin for appellants in proceeding No. 3.
Jacob M. Lewis, Stephen A. Wakefield, Marc Johnston, Percy H. Russell, Jr., Stuart M. Gerson, Frederick J. Scullin, Jr., and Leonard Schaitman, of the District of Columbia Bar, admitted pro hac vice, for intervenor-appellant in proceeding No. 2.
Robert Abrams, Attorney-General (Samuel A. Cherniak, O. Peter Sherwood, John W. Corwin, James Sevinsky, Charlie Donaldson and Leslie Allan of counsel), for Mario M. Cuomo, respondent in proceedings Nos. 1 and 2.
George A. Zimmerman and Stanley B. Klimberg for Long Island Power Authority, respondent in proceedings Nos. 1 and 2.
Wendy M. Lane, Arthur T. Cambouris and Charles M. Pratt for Power Authority of the State of New York, respondent in proceedings Nos. 1 and 2.
Richard A. Rapp, Jr., and Victor A. Staffieri for Long Island Lighting Company, respondent in proceedings Nos. 1, 2 and 3.
Lawrence G. Malone, William J. Cowan, Eleanor Stein and Jonathan D. Feinberg for Public Service Commission, intervenor-respondent in proceeding No. 1 and respondent in proceedings Nos. 2 and 3.
Chief Judge WACHTLER and Judges SIMONS and KAYE concur with Judge BELLACOSA; Judge HANCOCK, JR., dissents and votes to reverse in a separate opinion in which Judges ALEXANDER and TITONE concur.
*406 BELLACOSA, J.
The fundamental fulcrum of this case is the validity of the February 1989 "Settlement Agreement", providing essentially for the Long Island Power Authority (LIPA) to acquire the Long Island Lighting Company's (LILCO) Shoreham Nuclear Plant and to close that plant. We affirm the lower courts' determinations unanimously upholding the Agreement against a host of challenges.

I. SHOREHAM
LILCO's nuclear reactor power plant, sited on Long Island Sound in the Shoreham community of the Town of Brookhaven, Suffolk County, was conceived in 1965 as a 540 megawatt nuclear operation to be built at a cost of $124 million. LILCO's original objective was to provide better and reasonable power service to over three million people and industries in its huge *407 suburban service area. The existing plant, enlarged to 809 megawatts, was substantially completed in 1984 at a mushroomed cost of $5.5 billion, with carrying costs of approximately $30 million a month. Persistent and complex problems plagued this titanic project for almost three decades. Among the problems were varied concerns of this nature: regulatory, licensing, legal, multijudicial, financing, safety, labor/management, consumer, national/State/local political, and providing a reasonable/adequate power supply. Two major events provide historical context as well: the 1979 accident at the Three Mile Island Nuclear Power Station in Pennsylvania and the 1986 accident at Chernobyl in the Soviet Union.

II. LIPA ACT  POLICY
To try to solve the chain of impasses and crises, the Governor and the Legislature negotiated and produced the LIPA Act (the Act) in 1986 (L 1986, ch 517). The legislative findings specifically state that LILCO's decisions to commence and continue construction of Shoreham were "imprudent" and created "significant rate increases" which have resulted in "excessive" electricity costs to LILCO's service area customers (Public Authorities Law § 1020-a). The Legislature questioned whether Shoreham would ever operate or be capable of providing "sufficient, reliable and economic electric service" if it were to operate (Public Authorities Law § 1020-a; see, § 1020-h [1] [g]). The Legislature declared in the Act that this crisis created "a situation [of State concern] threatening the economy, health and safety * * * in the service area" (Public Authorities Law § 1020-a).

III. THE LIPA ACT
The Act created LIPA, a not-for-profit public corporation, to implement the Legislature's multiple objectives and policies (Public Authorities Law § 1020-c [1]). It conferred broad authority and power on LIPA to fulfill the primary statutory objectives: closing Shoreham, replacing LILCO as the provider of electric and gas power on Long Island, reducing power costs, or all of these (Public Authorities Law §§ 1020-f, 1020-g, 1020-h). The Act authorized LIPA to acquire "all or any part" of LILCO's securities or assets  including, of course, Shoreham  to further the legislative findings "as [LIPA] in its sole discretion may determine" providing that prior to "any such acquisition" LIPA determines that higher utility rates will not *408 result (Public Authorities Law § 1020-h [2] [emphasis added]). LIPA is authorized to acquire LILCO's securities or assets through negotiated instrument, tender offer or eminent domain (Public Authorities Law § 1020-h). The Act mandated that LIPA close and decommission Shoreham "forthwith" upon acquisition and consider possible alternative uses (Public Authorities Law § 1020-h [9]). It expressly prohibited LIPA from operating a nuclear power facility (Public Authorities Law § 1020-t), and gave LIPA the power "to determine the location, type, size, construction, lease, purchase, ownership, acquisition, use and operation of any generating, transmission or other related facility" (Public Authorities Law § 1020-g [c]).
Under the Act, LIPA is authorized to make and execute agreements and contracts "necessary or convenient in the exercise of [its] powers and functions" (Public Authorities Law § 1020-f [h]) and all State agencies are authorized "to enter into and do all things necessary to perform any such agreement" (Public Authorities Law § 1020-f [h]).

IV. THE 1989 SETTLEMENT AGREEMENT
After an unsuccessful effort in 1988 to reach agreement resolving the Shoreham crisis, and after an unsuccessful tender offer by LIPA to acquire LILCO (see, Public Authorities Law § 1020-h [3]), LILCO and the Governor signed the 1989 Settlement Agreement at issue in this case. The Agreement provided that LILCO would transfer the Shoreham plant to LIPA for $1 and LILCO would pay for all costs associated with Shoreham, pursuant to an "asset transfer agreement" incorporated in the Agreement. The Agreement provided that LIPA would contract with the Power Authority of the State of New York (PASNY) for the technical expertise necessary to close Shoreham. This was in furtherance of the legislative objective of closing Shoreham "forthwith" (Public Authorities Law §§ 1020-a, 1020-h [9]). The Agreement reflected the intent that LILCO be returned to an investment-grade financial condition as an investor-owned electric and gas company, and provided for LIPA to advise LILCO in developing a comprehensive least-cost power supply. PASNY agreed to construct additional power-generating facilities for LILCO if requested. The Agreement noted the Public Service Commission's (PSC) approval of a temporary LILCO rate increase for that rate year and expressed the understanding that LILCO's subsequent rate increases would be minimal. It provided for settlement of *409 related litigation, including LILCO's appeal to the Second Circuit Court of Appeals from a declaration that the Act was constitutional (Long Is. Light. Co. v Cuomo, 666 F Supp 370, appeal dismissed and judgment vacated 888 F.2d 230). LILCO retained the right to seek reinstatement of its Federal court appeal in the event LIPA exercised its statutory authority to acquire LILCO  still a viable, statutory authorization not precluded by the Agreement.
The 1989 Agreement was buttressed by an independent study, commissioned by LIPA, which demonstrated that LILCO's rates, freed of the Shoreham albatross, would be cheaper than LILCO's rates with Shoreham, thus satisfying the only condition legislatively imposed on LIPA's authority to acquire "all or any part of" LILCO's assets (see, Public Authorities Law § 1020-h [2]). The Agreement was subsequently evaluated and approved as required by the PSC, LIPA, PASNY and LILCO.
Petitioners, representing individuals, business groups and interest groups, commenced three separate CPLR article 78 proceedings challenging the execution and approval of this Settlement Agreement on various grounds.
We conclude that the essential rationale of the Per Curiam opinion at the Appellate Division (159 AD2d 141) dealing with LIPA's authority and SEQRA is sound. Its core conclusion bears emphasis: "[o]ne would be hard pressed to find language more clearly conveying legislative intent to give the implementing agency the broadest flexibility in administering the statute, including the discretion not to proceed with a full LILCO takeover" (159 AD2d, at 156 [emphasis added]). We also affirm and agree with the result and reasoning of the second determination brought up for our review and reflected in the Per Curiam opinion at 163 AD2d 700.
The Citizens for an Orderly Energy Policy and the Dollard petitioners contend that the Settlement Agreement contravenes the LIPA Act, subverts its legislative policy, violates the constitutional principle of the separation of powers, and leaps beyond the scope of statutory authority of the respondent Governor and executive agencies. Specifically, petitioners argue  and the dissenters agree  that LIPA is required to acquire LILCO itself before it may acquire and close Shoreham. They claim that respondents exceeded their statutory authority by making a Settlement Agreement which provides for Shoreham's closure independent of LIPA's replacement of *410 LILCO so that Long Island's power needs would be supplied only by a public power source.
These arguments, presented at considerable length and with complexity and sophistication, may be simplified for this part of our analysis. They proceed from the erroneous supposition that the exclusive or paramount objective of the LIPA Act was the acquisition and displacement of LILCO itself as a privately owned investor company supplying electric and gas utility services to Long Island. We conclude that the statute nowhere limits the Executive Branch and its agencies in this critical respect. Instead, the respondents acted within their respective constitutional and statutory authority and effected a properly delegated discretionary policy and purpose articulated and intended by the LIPA Act, i.e., the closure and decommissioning of Shoreham by LIPA.

V. STATUTORY AUTHORIZATION FOR CLOSING SHOREHAM
The Executive Branch and its agencies may not "go beyond stated legislative policy and prescribe a remedial device not embraced by the policy" in contravention of the separation of powers doctrine (Matter of Broidrick v Lindsay, 39 N.Y.2d 641, 645-646). However, only executive acts inconsistent with or arrogative of the Legislature's prerogatives violate the separation doctrine (Clark v Cuomo, 66 N.Y.2d 185, 189; Matter of Nicholas v Kahn, 47 N.Y.2d 24, 30; Rapp v Carey, 44 N.Y.2d 157, 163; Matter of Broidrick v Lindsay, supra, at 645-646). A check-and-balance in the distribution of powers is that the Legislative Branch may not delegate away its fundamental lawmaking powers or policymaking choices. The Legislature may, however, declare its policy in general terms by statute, endow administrative agencies with the power and flexibility to fill in details and interstices and to make subsidiary policy choices consistent with the enabling legislation (Boreali v Axelrod, 71 N.Y.2d 1, 10; Matter of Nicholas v Kahn, supra, at 31; Matter of Bates v Toia, 45 N.Y.2d 460, 464).
The Legislature is not required in its enactments to supply agencies with rigid marching orders, especially in a field as complex as nuclear power regulation, which is "simply incapable of statutory completion" and "where flexibility in the adaptation of the legislative policy to infinitely variable conditions constitute[s] the very essence [of the Act]" (Matter of Nicholas v Kahn, 47 N.Y.2d 24, 31, supra). The intricate nuances of the policy determinations required under the LIPA *411 Act deserve some respect from the Court. The specialized entity, LIPA, was created by the Legislature to concentrate on and resolve these matters within a reasonably defined and delegated range of expertise (see, Matter of Memorial Hosp. v Axelrod, 68 N.Y.2d 958, 960; Matter of Great Lakes-Dunbar-Rochester v State Tax Commn., 65 N.Y.2d 339, 343). The wisdom and prudence of the Legislature's flexible approach are not ours to question. Nor may the Court weigh the fiscal quid pro quos of the Settlement Agreement. Our role is simply to construe the enactment, its validity and its implementation.
There can be little doubt that the Act authorizes LIPA to acquire and close Shoreham. It allows LIPA to acquire "all or any part of the securities or assets of LILCO, as the authority in its sole discretion may determine" (Public Authorities Law § 1020-h [2] [emphasis added]; see also, § 1020-f [d]; § 1020-g [c]; § 1020-h [6] [a]). The Legislature wanted Shoreham closed and decommissioned, and it expressly declared its legislative policy that LIPA's acquisition, closure and decommissioning of Shoreham would accomplish an objective of the Act (Public Authorities Law §§ 1020-a, 1020-h [9]; § 1020-t; cf., Matter of Campagna v Shaffer, 73 N.Y.2d 237, 243; Boreali v Axelrod, 71 N.Y.2d 1, 6, 11-16, supra; Under 21, Catholic Home Bur. for Dependent Children v City of New York, 65 N.Y.2d 344, 356; Subcontractors Trade Assn. v Koch, 62 N.Y.2d 422, 429-430; Matter of Broidrick v Lindsay, 39 N.Y.2d 641, 646-647, supra).
In fact, closure of Shoreham was one of the overriding engines driving the emergency legislative initiative and package. The language of the Act and its legislative history cogently portray the Act's objectives: LIPA's acquisition and closure of Shoreham, or LIPA's takeover and replacement of LILCO as a utility provider, or both, dependent only on control of rates (see, Public Authorities Law §§ 1020-a, 1020-h). The objectives were not expressed as mandatory or paramount or indispensably linked or preconditioned upon each other. Thus, respondents cannot be said to have arrogated by administrative or executive fiat that which was not contemplated or delegated by the Legislature (Matter of Campagna v Shaffer, 73 N.Y.2d 237, 242, supra), and did not "effect [their own] vision of societal policy choices" (id., at 242) or act on a "clean slate", thereby invading the nondelegable legislative policymaking function (Boreali v Axelrod, 71 N.Y.2d 1, 13, supra). To be sure, this Settlement Agreement did not, by any stretch of the facts, result from executive fiat; rather, it was the product of a constitutional and statutorily authorized resolution of the *412 Shoreham crisis by LIPA, LILCO and the Governor and executive agencies (contrast, Youngstown Co. v Sawyer, 343 US 579 [a totally inapposite case, cited by the dissenters at 428-429, whose essential facts are the seizure of the country's steel mills unilaterally by President Truman to deal with a strike during the Korean War]).
Appellants and the dissenters would have the Court construe the comprehensive statute (Public Authorities Law § 1020-h [9]) in a strained and inflexible fashion, producing absurd results. Their legislatively unintended all-or-nothing approach would reinstate the Shoreham crisis, producing a plain contradiction of a critical objective of the statute.
The Act conferred broad discretion on LIPA, delegated to it "all of the powers necessary or convenient" to implement its multipronged, complicated purposes (Public Authorities Law § 1020-f), and provided for liberal construction of its terms to effectuate its purposes (Public Authorities Law § 1020-ff). Appellants' and the dissenters' interpretation, relying on an inference by negative implication that the Public Authorities Law withholds authority from LIPA to close Shoreham, unless it completely takes over LILCO, is simply wrong. The pertinent subdivisions, the strained cross-incorporation by reference of general preamble language, and the Act overall do not impose or create such a requirement. Further, the negative inference approach is a disfavored interpretive tool, especially in the face of a broad delegation of appropriate discretion and authority designed to effect the stated legislative goals of closure, found throughout the whole Act read as an integrated, complex, emergency package of legislation (see, Matter of City of New York v State of New York Commn. on Cable Tel., 47 N.Y.2d 89, 92; see also, Clark v Cuomo, 66 N.Y.2d 185, supra). Indeed, none of the legislative history on which the dissenters rely supports their judicial incorporation into the Act of a conditional restriction that LIPA was without authority to acquire Shoreham in a negotiated agreement unless it simultaneously engaged in a full scale buyout and replacement of LILCO.
The only condition attached to LIPA's decision to acquire any or all of the assets or stock of LILCO is LIPA's determination that such acquisition would result in rates to LILCO's customers not higher than LILCO would have charged had there been no such acquisition (Public Authorities Law § 1020-h [2], [4], [10]). Once that threshold is satisfied, LIPA is *413 empowered  but not required  to make any such acquisition. No provision can be found anywhere in the Act which expressly or by reasonable implication requires that LIPA must exert its full acquisition authority contemporaneously with the acquisition and decommissioning of Shoreham itself, i.e., "making LIPA's authority to acquire any part of the LILCO property conditional on LIPA's replacing LILCO" (dissenting opn, at 418; see also, 419, 420, 424-425, 427-428). No matter how many times or different ways such an unfounded interpretation is repeated, the fact remains that the Act simply does not "condition" LIPA's acquisition of Shoreham on its acquisition also of all of LILCO's assets and replacement of privately owned LILCO with a public utility provider. One would, in any event, expect a critical precondition feature of this kind to be expressed or readily ascertainable if it were ever intended. It is not, and that is not surprising, for that could have paralyzed LIPA from bringing about a plainly intended goal: the closing of Shoreham.
Appellants claim that the Agreement, because it provided for the continued operation of LILCO, conflicts with the legislative goal to put LILCO out of business by a takeover and substitution with a public power supplier. While the Legislature indicated in the Act that it contemplated  based on information and conditions at the time of enactment  that replacement of LILCO with a publicly owned power authority would be the "best" or "most appropriate" method of remedying the host of emergency problems addressed by the Act (especially closing Shoreham) (see, Public Authorities Law §§ 1020-a, 1020-h [1] [a], [n]), the Legislature reposed in LIPA the flexible authority to make the ultimate choice among statutory alternatives. LIPA was authorized to acquire all or any part of LILCO's stock and assets (Public Authorities Law § 1020-h), but the Act does not mandate or direct LIPA to do so or to replace LILCO at any given time or as a precondition to achieving other key legislative objectives.
Acquisition of all of privately owned LILCO's assets by eminent domain or otherwise would cost billions of taxpayer dollars (hardly a "bail out" [dissenting opn, at 418]); this is a factor the Legislature recognized in affording LIPA broad authority with respect to whether such a total acquisition was feasible, or necessary, or might contribute to higher rather than lower rates because of the financing costs alone of such a monumental public acquisition of a privately owned utility (Bill Jacket, L 1986, ch 517, Budget Report on Bills, at 7; id., *414 Report of Comptroller, at 19). We emphasize that the recurring and unavoidable theme reflected in the legislative history is that the intended sine qua non objective of the Act was to give LIPA the authority to save ratepayers money by controlling and reducing utility costs (Bill Jacket, Assembly Mem, at 14; id., Budget Report, at 6; id., Executive Approval Mem, at 12; id., Executive Mem, at 15). It was not to force LIPA to replace LILCO as the service area utility provider in order to achieve the legislative objective of closure of Shoreham and elimination of Shoreham's impact on utility rates.
Indeed, the Governor, in approving the LIPA Act legislation, emphasized that the core objective of the Act was to produce ratepayer savings, which he recognized might not necessarily be achieved by a complete conversion to public power through LIPA's replacement of LILCO (Governor's Approval Mem, 1986 McKinney's Session Laws of NY, at 3178).
Further, under the terms of the Agreement, LIPA did not permanently forego the exercise at some time of its delegated power to acquire and supplant LILCO should it decide in its "sole discretion" that doing so would accomplish the Act's objective of controlling utility costs to LILCO customers (see, Public Authorities Law § 1020-h [2]). The Agreement is not structured to expressly prohibit acquisition by LIPA of any part of LILCO other than Shoreham, as the Agreement in no way precludes LIPA from exercising its full range of statutory choices under the LIPA Act depending on the time and circumstances, including market conditions and the State's fiscal situation. Rather, the Agreement plainly accomplished an urgent objective of the Act: the prevention of further rate increases attributable to the Shoreham enterprise.
We emphasize that our decision in this respect focuses solely on the statutory interpretation concerning the delegation, implementation and distribution of governmental public utility power as it pertains to Shoreham. We imply no views  which would be irrelevant and inappropriate in any event  about the wisdom of nuclear power, public power, or punishment of private power companies for failed and costly enterprises. We conclude only that a rational choice was made by the entities charged with the implementing authority  legitimate "means"  based on delegated power and on the record before us to achieve a legislative goal  the legitimate "end" of Shoreham (dissenting opn, at 428).

*415 VI. SEQRA
The Dollard petitioners and the intervenor United States Department of Energy argue that the Settlement Agreement violates SEQRA. Specifically, they contend that the Governor and administrative agencies had to produce Environmental Impact Statements (EIS) before making or approving this Agreement with LILCO to transfer Shoreham to LIPA for closure and decommissioning. They add that PASNY also had to do a SEQRA review before it agreed to aid LIPA in decommissioning Shoreham by building baseload generating plants for LILCO in the future, if LILCO requested. We agree with the Appellate Division that, as to each aspect of this SEQRA argument, the Settlement Agreement was "either statutorily exempt from SEQRA, or so tentative and premature as not yet to trigger SEQRA review" (159 AD2d 141, 159).
Primary guidance is found in the LIPA Act, which declares that LIPA's acquisition of LILCO's assets or stock is not State "action" subject to SEQRA, and that SEQRA "shall not be applicable in any respect to such acquisition or any action of [LIPA] to effect such acquisition." (Public Authorities Law § 1020-s [2].) Nothing in this respect could be plainer.
Appellants and the dissenters, with entirely inapposite authorities, nevertheless urge that the decision to decommission triggered an immediate full-scale SEQRA prerequisite to the Settlement Agreement itself. "[O]fficial acts of a ministerial nature, involving no exercise of discretion", are expressly exempt from SEQRA (ECL 8-0105 [5] [ii]). A "ministerial act" is an action performed "in a prescribed manner imposed by law without the exercise of any judgment or discretion as to the propriety of the act" (6 NYCRR 617.2 [x] [emphasis added]). Actions of the State Legislature are also exempt (6 NYCRR 617.2 [q] [5]). When it passed the LIPA Act, the Legislature  inescapably aware of the inherent environmental consequences of Shoreham's shutdown  necessarily judged for itself the propriety of closure and decommissioning and mandated such action (Public Authorities Law §§ 1020-a, 1020-h [9]). LIPA's decision to fulfill the legislative objective to close and decommission Shoreham was not an action subject to SEQRA because LIPA had no choice in this respect; its acquisition of Shoreham triggered a legislatively mandated, ministerial consequence, i.e., to shut it down forthwith.
Appellants argue that decommissioning was not mandatory on these facts and, thus, is not entitled to the ministerial *416 exemption provision as that highly specialized legal word of art is employed in the SEQRA field. They essentially argue that under Public Authorities Law § 1020-h (9), LIPA's closure and decommissioning of Shoreham were mandatory only if LIPA acquired controlling shares of LILCO or all of LILCO's assets  but not if it just acquired Shoreham. This interpretation is not supported by legislation or logic. First, whether or not LIPA acquired, in addition to Shoreham, the rest of LILCO's stock or remaining assets has no greater or lesser bearing on the potential for environmental consequences arising out of LIPA's acquisition of only the Shoreham asset. Thus, it is not rational to differentiate between the two scenarios. The statute does not do so, and to do so by statutory construction leads to an unacceptable anomaly. The lesser circumstance could not rationally be subject to more severe restrictions than the greater.
Second, the Legislature allowed LIPA to acquire Shoreham only, expressed that decommissioning was a central objective of the Act, precluded LIPA from running Shoreham, and certainly understood and intended that if LIPA acquired Shoreham it must "forthwith" close and decommission it. "Forthwith" in this circumstance would surely be an oxymoronic usage if the Legislature were deemed to have compelled the SEQRA process in this circumstance only, because that would freeze the shutdown and decommissioning process.
Viewed in another light, appellants' restrictive interpretation would compel this syllogism: if LIPA determined that acquisition of LILCO itself would not effect the Act's objectives but that acquisition of Shoreham only would, LIPA must nevertheless choose the total takeover route to avoid SEQRA review of the lesser, common objective. Such a trap makes no sense and could not have been intended.
We emphasize that what was "ministerial" here was LIPA's nondiscretionary action in complying with the Legislature's mandate that Shoreham be decommissioned. It was not up to LIPA to produce an EIS to evaluate the propriety of the legislative policy choice of decommissioning because, in this case, mandating SEQRA review would have the effect of overriding the Legislature's express exemption (6 NYCRR 617.2 [q] [5]).
Finally, we agree with the Appellate Division determination that PASNY's agreement to aid LIPA in decommissioning and constructing alternative generating facilities for LILCO, if *417 requested, are proposed actions which had not reached the point at which SEQRA review is required at the time the Agreement was made (159 AD2d 141, 160, supra; see, Matter of Programming & Sys. v New York State Urban Dev. Corp., 61 N.Y.2d 738, 739; Matter of Tri-County Taxpayers Assn. v Town Bd., 55 N.Y.2d 41, 46-47). No decommissioning plan had been proposed or selected; no plans to build generating plants to replace Shoreham had been proposed or formulated; and no decision even to build such plants had been made. The subsequent selection of a specific decommissioning method has already received full environmental review, culminating in a Final Generic Environmental Impact Statement in 1990, which has not been challenged by appellants. PASNY's construction of facilities  if ever undertaken  will be subject to independent SEQRA review when a specific project plan is actually formulated and proposed.
All other arguments, including those addressed to whether the PSC satisfied the requirements of the State Administrative Procedure Act, have been reviewed and require no further discussion, as they are without merit or affect on the dispositive analysis or result, or have been addressed in the Per Curiam opinions of the Appellate Division with which we agree.
Accordingly, in Matter of Citizens, the order of the Appellate Division should be affirmed, with costs. In Matter of Dollard and in Matter of Nassau Suffolk Contr.'s Assn., the judgments should be affirmed, with costs.
HANCOCK, JR., J. (dissenting).
This case involves the constitutional limits on the reach of gubernatorial power, not the relative merits of nuclear power, the wisdom of a nuclear-oriented national energy policy, or whether the Shoreham nuclear power facility should be decommissioned.[1] The critical *418 issue is whether the Governor, purporting to act under the authority of the LIPA statute, has effectively overruled that statute and defeated its very purpose by:
(1) directing that LIPA acquire Shoreham in disregard of the statute's specific provisions making LIPA's authority to acquire any part of the LILCO property conditional on LIPA's replacing LILCO as the public utility on Long Island and being able to furnish power at lower rates;
(2) failing to fulfill the statutory aim of providing a public authority as the source of power on Long Island; and,
(3) countermanding the legislative policy of substituting public for private power on Long Island with an agreement to "bail out" the existing private power company and to perpetuate its operation as the power provider on Long Island.
Because the central issue is whether the Governor acted in excess of his lawfully delegated authority, the decision necessarily has serious implications for the formulation and implementation of policy in State government and the doctrine of separation of powers (see, e.g., Matter of Campagna v Shaffer, 73 N.Y.2d 237, 242; Boreali v Axelrod, 71 N.Y.2d 1, 14; Under 21, Catholic Home Bur. for Dependent Children v City of New York, 65 N.Y.2d 344; Clark v Cuomo, 66 N.Y.2d 185, 189; Matter of Nicholas v Kahn, 47 N.Y.2d 24, 30; Rapp v Carey, 44 N.Y.2d 157, 163; Matter of Broidrick v Lindsay, 39 N.Y.2d 641, 645-646). No one suggests that the Governor's actions were a proper exercise of executive authority under the powers granted generally in article IV of the State Constitution. The Governor acted properly, the majority maintains, under power expressly delegated to him by the Legislature in the LIPA statute (Public Authorities Law §§ 1020  1020-hh). The categorical position of the dissent is that there is no such authority in the LIPA statute and that, moreover, the 1989 "Settlement Agreement" and the actions which it mandates are in direct violation of the LIPA statute.
The detailed analysis of the specific provisions of the statute in part I of this dissent, infra  particularly the analysis of the critical subdivision (1), (2) and (10) of section 1020-h (infra, at 422-426) which the majority has not challenged  proves that the majority's interpretation flatly contradicts specific language in the statute and the underlying purpose and policy set forth in the legislative declarations and manifested in the statutory scheme and relevant legislative history.
The majority opinion contains no analysis and refers to no *419 specific language or portion of the statute or of the legislative history supporting its interpretation. Rather, it simply reaches its conclusion by assuming the validity of the following three propositions which the statutory language refutes:
(1) that the closing of Shoreham was one of the statute's two independent primary aims and that "[t]he language of the Act and its legislative history cogently portray the Act's objectives: LIPA's acquisition and closure of Shoreham, or LIPA's takeover and replacement of LILCO as a utility provider" (majority opn, at 411 [emphasis added]);
(2) that despite the statutory language (see, § 1020-h [1], [2], [10]) making acquisition of any part of the LILCO property (including Shoreham) specifically contingent on LIPA's replacing LILCO as the Long Island utility provider, LIPA is, nevertheless, authorized to acquire Shoreham alone without taking over from LILCO as the utility provider (see, majority opn, at 407, 409, 411); and
(3) that although LIPA is not an agency of the State but an independent corporate entity created under the Public Authorities Law to furnish electricity, and although the statute lacks any language suggesting otherwise, LIPA should, nevertheless, be viewed as an administrative agency of the State endowed by the Legislature with "the power and flexibility" (majority opn, at 410) to make "policy choices" (id.) in the "complex" field of "nuclear power regulation" (id., at 410) and that the "intricate nuances of the policy determinations required under the LIPA Act deserve some respect from the Court" (id.).
Any reading of the statute and its history compels conclusions (diametrically opposed to those reached by the majority) that:
(1) the goal of the LIPA statute is to substitute publicly furnished power for private power on Long Island, and that closing Shoreham is entirely incidental to and dependent upon the achievement of that goal;
(2) LIPA's exercise of discretion to acquire "all or any part" of LILCO is expressly contingent on LIPA's replacing LILCO as the utility supplier on Long Island, and that the transfer of Shoreham to LIPA while LILCO remains as the utility provider on Long Island is not authorized by the statute and, indeed, is contrary to it;
(3) LIPA is not an administrative agency of the State and has no authority to make rules or policy choices "consistent *420 with the enabling legislation" (majority opn, at 410) like the executive departments in the cases cited by the majority (majority opn, at 410)  e.g., Boreali v Axelrod (71 N.Y.2d 1 [Department of Health]), Matter of Nicholas v Kahn (47 N.Y.2d 24 [Department of Public Service]), Matter of Bates v Toia (45 N.Y.2d 460 [Department of Social Services]). LIPA is an independent public corporation created under the Public Authorities Law having the general powers that are typically given to public authorities (§ 1020-f) and the specific powers "to provide and maintain generating, transmission and resource recovery waste to energy facilities" (§ 1020-g) including significantly the following:

"After the establishment of Long Island Power Authority (LIPA) and the commencement of its function as a utility, LIPA shall acquire from LILCO all franchise and utility service responsibilities for all ultimate consumers of gas and electricity within LILCO's former service territory, including the responsibility to provide safe and adequate service" (§ 1020-g [n] [emphasis added]).
To be sure, the public authority is given the limited discretion necessary to carry out its corporate purposes (e.g., to negotiate terms of purchase [§ 1020-h (2)], to determine amount of tender offer [§ 1020-h (3)] or to commence a taking by eminent domain [§ 1020-h (4)]). But, it is inconceivable that by giving LIPA its charter the legislators could have intended to set in motion an uncontrollable public entity with sufficient autonomy to subvert the very purpose for which they created it and to violate their express mandate making acquisition of any part of the LILCO property contingent on LIPA's becoming the power provider. How the majority's theory can be adopted without attributing such remarkable intention to the legislators is not explained.
The Governor's action in implementing the "Settlement Agreement" is an assertion of unauthorized executive power and a usurpation of legislative authority in sharp conflict with the doctrine of separation of powers which we have emphatically reaffirmed as a vital principle in New York jurisprudence (see, Under 21 v City of New York, supra, at 355-356). I, therefore, dissent on this ground.
I agree, moreover, with the arguments advanced by the United States Attorney on behalf of the United States and by other appellants that the "Settlement Agreement" insofar as *421 it calls for the decommissioning of Shoreham without SEQRA review, must be vacated as an invalid action (see, Chinese Staff & Workers Assn. v City of New York, 68 N.Y.2d 359, 368-369).
Any reasoned discussion of the constitutional and separation of powers issues must start with a description of the LIPA statute and a comprehensive analysis of the statute's purpose and underlying policy and of the relevant legislative history.

I
A. The Crisis
The LIPA Act and the movement to replace the Long Island Lighting Company (LILCO) with a public power authority arose out of increasing concern for the reliability and affordability of electric power on Long Island. Rapidly escalating rates, excessive costs, insufficient power supply, and the economic ruin of LILCO were serious threats to the Long Island economy (see, Public Authorities Law § 1020-a; Assembly Mem, Bill Jacket, L 1986, ch 517, at 13). Although the environmental and financial problems posed by Shoreham initiated the public concern, the focus of that concern was on LILCO's mismanagement and unresponsiveness to the public which caused many to "view LILCO as having breached its public trust and no longer deserving of exercising its monopoly electrical and gas franchise" (Assembly Mem, id., at 14; see also, Governor's Mem, id., at 15; Budget Report on Bills, id., at 5). In 1986, the Governor and the Legislature approved funding of the "Sawhill Report" on "[t]he specific means by which public power could be implemented on Long Island" as "one mechanism which could provide substantial benefits to ratepayers on Long Island" (Governor's Approval Mem, id., at 12). Throughout the drafting and approval of the statute, replacement of LILCO by a public authority remained the objective (see, e.g., Mem of New York State Energy Office, id., at 39 ["The Authority (LIPA) would be created for the purpose of acquiring the assets or securities of the Long Island Lighting Company (LILCO) and providing electric and gas service in the franchise area currently served by the company"]; Attorney-General's Mem, id., at 9-11 ["The purpose of the bill is to create a non-profit corporate instrumentality of the State * * * which is mandated to employ the most cost-effective method of acquiring LILCO * * * Under LILCO, Long Island's electric rates will remain inordinately high whether or not *422 Shoreham opens * * * Clearly, drastic relief is needed, and this bill will put Long Island on a new course."]). Indeed, in his Approval Message, the Governor stated:

"Replacement of LILCO with a public power authority is designed to resolve the problems caused by LILCO's imprudence and mismanagement, to operate LILCO's system more reliably, safely, efficiently and economically * * * and to place control of LILCO's system in the hands of elected representatives of the ratepayers" (1986 NY Legis Ann, at 242 [emphasis added]).
That the replacement of LILCO by LIPA as the power provider is the only solution offered by the Legislature to the crisis on Long Island and is the aim of the LIPA statute is made clear in the Legislature's own statement of the statute's objectives and purposes. Section 1020-a, "Declaration of legislative findings and declarations", states:
"Constantly escalating and excessive costs of electricity * * * pose a serious threat to the economic well-being, health and safety of residents of and the commerce and industry in the service area * * *
"Such matters of state concern best can be dealt with by replacing such investor owned utility with a publicly owned power authority * * * In such circumstances, such an authority will provide safe and adequate service at rates which will be lower than the rates which would otherwise result * * * realizing savings for the ratepayers and taxpayers in the service area and otherwise restoring the confidence and protecting the interests of ratepayers and the economy in the service area. Moreover, in such circumstances the replacement of such investor owned utilities by such an authority will result in an improved system and reduction of future costs and a safer, more efficient, reliable and economical supply of electric energy" (Public Authorities Law § 1020-a [emphasis added]).
B. The Legislative Solution
The statutory policy of section 1020-a is fulfilled by the mandates in the subsequent sections of the statute. Under section 1020-c, the newly created LIPA is a public corporation *423 created under the Public Authorities Law to be operated only on a not-for-profit basis in the area previously serviced by LILCO (see, §§ 1020-c, 1020-b [17]). LIPA is granted powers by section 1020-g necessary to fulfill its corporate purpose, the generation and transmission of electricity. Upon LIPA's commencing operation, section 1020-g (n) provides that "LIPA shall acquire from LILCO all franchise and utility service responsibilities for all ultimate consumers" (emphasis added).
LIPA is empowered to acquire LILCO stock and assets pursuant to section 1020-h. Of central importance to the acquisition and replacement of LILCO by LIPA is section 1020-h (2):

"In furtherance of the legislative findings and determinations set forth in subdivision one of this section, the authority is hereby authorized and empowered to acquire, through purchase or the exercise of the power of eminent domain, all or any part of the securities or assets of LILCO, as the authority in its sole discretion may determine; provided, however, that prior to proceeding with any such acquisition under this title, the board shall determine * * * that the rates projected to be charged after such acquisition * * * will not be higher than the rates projected to be charged by LILCO during such period if such acquisition had not occurred" (emphasis added).
Although this section vests LIPA with discretion to acquire "all or any part" of LILCO, the exercise of that discretion is expressly contingent and qualified as set forth in the following significant provisions.
Any exercise of discretion under section 1020-h (2) in acquiring any part of LILCO must be "[i]n furtherance of the legislative findings and determinations set forth in" section 1020-h (1) (emphasis added). Under section 1020-h (1), the Legislature "expressly finds and determines" that:
"(a) The acquisition by the authority * * * of either the securities or assets of LILCO * * * is the most appropriate means of dealing with the emergency * * * in the service area";
and,
"(b) The authority, prior to exercising its power of eminent domain to acquire stock or assets of *424 LILCO, shall enter into negotiations with LILCO for the purpose of acquiring such stock or assets upon such terms as the authority, in its sole discretion, determines will result in rates equal to or less than the rates which would result if LILCO were to continue in operation."
Thus, in the foregoing provisions it is unequivocally specified that the only purpose for which LIPA may exercise its acquisition authority (§ 1020-h [2]) is one which furthers the replacement of LILCO by LIPA and results in utility rates "equal to or less than the rates which would result if LILCO were to continue in operation".
Moreover, the language following the phrase "provided, however," makes any acquisition of LILCO property contingent upon the LIPA Board's first determining that after the acquisition, the projected rates "will not be higher than the rates projected to be charged by LILCO during such period if such acquisition had not occurred" (emphasis added).
If there can be any doubt remaining that the statute makes LIPA's discretion to acquire any part of LILCO's property conditional on LIPA's replacing LILCO it is removed by section 1020-h (10):
"If the authority determines, in its sole discretion, that the total cost of acquisition will result in rates in excess of the rates which would result from continued operation by LILCO, the authority shall abandon the acquisition" (emphasis added).
If the cost to LIPA of exercising its acquisition discretion would subsequently prohibit LIPA from charging lower rates, then LIPA must abandon its acquisition plans (§ 1020-h [10]).
It must be emphasized that the majority does not attempt to support its assertions that the statute somehow envisions LILCO (not LIPA) as the power provider after acquisition (see, e.g., majority opn, at 407, 409, 411) by reference to or analysis of any statutory provision. The reason is clear. The statute (§ 1020-h [1] [b]; [2], [4], [10]) rules out any possibility that LILCO and not LIPA could have been envisioned as the power provider after acquisition. That this is so is not a conclusion based on "negative inference" (majority opn, at 412), but the unequivocal mandate of express statutory provisions. Only LIPA was intended to be the power provider. Both section 1020-h (1) (b) and (10) refer to the effect that "cost of acquisition" (i.e., of LILCO by LIPA) will have on rates to be charged *425 after acquisition by LIPA. Section 1020-h (1) (b) and (10) provide that if the terms of acquisition "will result" in rates in excess of "the rates which would result if LILCO were to continue in operation" (§ 1020-h [1] [b] [emphasis added]), then the acquisition is not to go forward. The "cost of acquisition" (§ 1020-h [10]) and of "acquiring" (§ 1020-h [1] [b]) could only be a cost borne by LIPA, the acquiring entity. The effect of such cost on rates could only refer to the rates to be charged by LIPA as power provider after acquisition. Indeed, any construction of the statute linking cost of acquisition to rates to be charged after acquisition by LILCO, the acquired entity, would render the statute absurd and must be rejected (McKinney's Cons Laws of NY, Book 1, Statutes § 145).[2]
It is significant that, in previous Federal litigation construing the LIPA statute, LIPA itself argued that the acquisition and decommission of Shoreham is preconditioned on its replacement of LILCO as the power provider (see, Long Is. Light. Co. v Cuomo, 666 F Supp 370 [ND NY 1987, Munson, Ch. J.], appeal dismissed and judgment vacated 888 F.2d 230 [2d Cir 1989]). LIPA argued to the District Court[3] that:
"Finally, LILCO challenges § 1020-h(9) which provides that LIPA shall close Shoreham `as soon as practicable after the authority has acquired sufficient shares of LILCO stock to do so or after it has acquired all the property of LILCO pursuant to this title' * * * LILCO's allegation that § 1020-h(9) would unconstitutionally deprive it of its property ignores the fact that the subsection has no effect unless and until LIPA either owns all of LILCO's property or is the controlling shareholder of LILCO" (emphasis added)
*426 and to the Second Circuit that:
"In short, § 1020-h(3)(b) rationally advances the Legislature's objective of establishing a public authority to replace LILCO by insuring that LIPA can promptly merge with LILCO if two-thirds of the outstanding LILCO common shares  the percentage required to approve any BCL merger  are tendered" (emphasis added).
C. The Settlement Agreement
Subsequent to the passage of the statute, the newly formed LIPA attempted unsuccessfully to acquire LILCO by tender offer as authorized by section 1020-h (3) and LILCO brought an action in Federal court challenging the constitutionality of the statute (see, Long Is. Light. Co. v Cuomo, 666 F Supp 370 [ND NY 1987], appeal dismissed and judgment vacated 888 F.2d 230 [2d Cir 1989], supra). In 1988 LILCO, LIPA, Governor Cuomo, and others reached an agreement settling the Federal court litigation and other actions  the 1988 Settlement Agreement. Because the Agreement required legislative approval before becoming effective, Governor Cuomo called the Legislature into special session to ratify the Agreement. The Legislature, however, voted not to ratify the Agreement. According to Assembly members, the Agreement "undercut the Legislative intent of the passage of the Long Island Power Authority Act" to replace LILCO with a public power authority. The 1988 Agreement was subsequently modified and reexecuted, in substantially identical form, as the 1989 Settlement Agreement at issue in this case but did not expressly require legislative approval. The Legislature, however, again refused to pass the requested legislative approval thought to be necessary for the performance of the agreement.
Although the policy of the LIPA Act was to replace LILCO, the Settlement Agreement does the opposite: it retains LILCO, a privately owned company, and calls for publicly financed measures to save it from economic ruin. The Agreement states that "the parties intend that LILCO be returned to investment grade financial condition as an investor-owned electric and gas corporation". All litigation between LIPA and LILCO would be discontinued except that each action may be reinstated "in the event LIPA attempts to acquire an interest in LILCO by any means" (Settlement Agreement). In addition, LILCO would transfer the Shoreham facility to LIPA for $1 *427 and in return LILCO would be the beneficiary of several financial recovery commitments. These include:
1. Guaranteed rate increases of 5% in 1989 and 1990, and projected increases of 4.6% each year through 1999 (see, PSC Opn No. 89-8);
2. A minimum of $100 million per year of State Industrial Development Bonds for a minimum of five years (see, 1989 Settlement Agreement);
3. Commitment that the New York Power Authority, at LILCO's request, will construct and operate three power generation facilities and provide LILCO with additional power transmission facilities (see, Amended Mem of Understanding Concerning Proposed Agreements);
4. Commitment that LILCO's annual electric rates will be calculated to "enable LILCO to become current on all preferred dividends * * * and to resume payment of common dividends" at $1 per share in 1989, $1.50 per share in 1990, and $2 per share in 1991 (see, Settlement Agreement; see also, Lazard Freres Study);
5. Commitment that LILCO's annual electric rates will be adequate for the establishment of a "Financial Resource Asset" having a Base Financial Component sufficient to "restore LILCO's General & Refunding Debt to an investment grade rating (Baa 3 by Moody's or BBB by Standard and Poors at a minimum)" (id., at § 2 [d]);
6. Realization by LILCO of a $2 billion "deductible abandonment loss" for Federal income tax purposes as a result of its transfer of Shoreham to LIPA for $1 while the nuclear power facility is being decommissioned (see, IRS Priv Ltr Rul 8,850,016; see also, Statement of Trustee Kidder);
7. Commitment to retransfer the Shoreham real estate to LILCO for $1 after the decommission of the nuclear power facility (see, Amended and Restated Asset Transfer Agreement).
D. The Settlement Agreement is not Authorized
The Settlement Agreement thwarts the statutory policy of providing public power on Long Island by initiating, instead, a publicly financed resuscitation of LILCO. The acquisition of *428 Shoreham alone and without any provision for the replacement of LILCO as power provider flatly contravenes the statutory language conditioning the exercise of LIPA's discretion to acquire "all or any part" of LILCO on the replacement of LILCO. Unlike the majority, we can find no authority in the LIPA statute for this financial rescue of a private corporation at the expense of the taxpayers and ratepayers. The majority apparently finds such authority under its "liberal construction" (majority opn, at 410) of the statute to insure that Shoreham is not operated, even though the parties concede that the dismantling steps already taken are "irreversible" (see, dissenting opn, n 1, supra). Indeed, the Legislature has twice refused to condone such a construction (see, supra, at 426).
This executive action implementing the Settlement Agreement cannot be cast as somehow being within the discretion broadly delegated to an administrative agency dealing with the technical field of nuclear power regulation (see, majority opn, at 410). LIPA is not an administrative or regulatory agency, but an independent public corporation organized under the Public Authorities Law (see, Matter of New York Post Corp. v Moses, 10 N.Y.2d 199, 203-204; see generally, 87 NY Jur 2d, Public Authorities, § 1). For the same reason, no basis exists for suggesting (majority opn, at 410, 411, 412, 413) that the action deserves the sort of deference sometimes accorded to agencies in interpreting the statutes they are charged with administering (cf., Matter of Memorial Hosp. v Axelrod, 68 N.Y.2d 958).
Some of respondents have suggested that more than ordinary deference should be given to the "Settlement Agreement" on practical grounds or because they claim it is the "best deal" that could be worked out. Unstated but necessarily subsumed in such suggestions is the proposition that there may be times when the ends do justify the means, even those not permitted by the law. There can be no more effective response to just such appeals to expediency than that given by Mr. Justice Robert Jackson in Youngstown Co. v Sawyer (343 US 579):
"The Executive, except for recommendation and veto, has no legislative power. The executive action we have here originates in the individual will * * * and represents an exercise of authority without law * * * With all its defects, delays and inconveniences, men have discovered no technique *429 for long preserving free government except that the Executive be under the law, and that the law be made by parliamentary deliberations.
"Such institutions may be destined to pass away. But it is the duty of the Court to be last, not first, to give them up" (Jackson, J., concurring opn, at 655).
Here, the Legislature has declared the policy: that the power crisis on Long Island should be met by replacing LILCO with a public authority as power provider and it has made acquisition of any part of LILCO's property contingent on LIPA's becoming the power provider and being able to do so at lower rates. The Settlement Agreement implements the opposite policy  i.e., retaining and revitalizing the private utility  and disregards the express statutory conditions on the acquisition of LILCO property. The debatable questions as to which policy better serves the public interest are not before us. But the answer to the legal question is certain. If, as respondents contend it should be, the policy of the Legislature as set forth in the LIPA statute should be rejected and another substituted, it must be by legislative action. The Legislature's policy cannot constitutionally be rejected and replaced by executive fiat.

II
The provision of the 1989 Settlement Agreement which mandates that Shoreham be decommissioned commands an "action" (ECL 8-0105 [4]; 6 NYCRR 617.2 [b]) requiring SEQRA compliance. Unquestionably, the decommissioning and disposal of Shoreham pose "significant environmental impacts" (ECL 8-0109 [2]). Respondents do not dispute this. Rather, they contend, and the majority agrees, that the decommissioning of the Shoreham facility is exempt from SEQRA compliance because it is authorized by section 1020-h (9) and therefore falls within the ministerial act exemption from SEQRA (ECL 8-0105). I disagree.
Contrary to the majority's assertion (majority opn, at 415-416, 416) that decommissioning Shoreham is exempt from SEQRA because it is "mandatory", an action is not exempt from SEQRA compliance as ministerial merely because it is legislatively mandated (see, Matter of Rye Town/King Civic Assn. v Town of Rye, 82 AD2d 474; Matter of Tuxedo Conservation & Taxpayers Assn. v Town Bd., 96 Misc 2d 1, affd 69 AD2d 320). To *430 be exempt, an act must be an official act "of a ministerial nature, involving no exercise of discretion" (ECL 8-0105 [5] [ii]) and "performed upon a given state of facts in a prescribed manner imposed by law without the exercise of any judgment or discretion" (6 NYCRR 617.2 [x]). For an act to be "of a ministerial nature", it must appear that the Legislature has commanded that act and specified the standards for or methods of its implementation. In specifying both the result and the procedure by which it is to be achieved, the Legislature forecloses all opportunity for exercise of discretion by removing any "latitude of choice" regarding implementation (see, e.g., Matter of Filmways Communications v Douglas, 106 AD2d 185, 186 [issuance of a construction permit held ministerial because building code specified standards, which if met, required issuance of license]).
There are separate environmentally significant decisions of two different types involved in decommissioning Shoreham. First, the very decision of whether to decommission Shoreham  without consideration of the particular procedures to be employed  unquestionably involves questions of enormous environmental concern. Like the initial proposal to build a food processing plant (see, Bardon v Town of N. Dansville, 134 Misc 2d 927) or the initial creation of a sewer district to construct sewer facilities (see, Matter of Tri-County Taxpayers Assn. v Town Bd., 79 AD2d 337), the initial direction to go forward with the project, standing alone, poses concededly serious environmental problems regardless of what ultimately may be the steps taken or the procedures followed in carrying it out.
The second type of environmentally significant decision in closing Shoreham  once the determination to go forward has been made  entails the plans for decommissioning and the methods to be employed. That such decisions will undoubtably require separate SEQRA compliance  as respondents point out  does not diminish the environmental impact from the initial direction to decommission or obviate the necessity for SEQRA compliance with regard to it. Subsequent SEQRA compliance in making the decisions as to how a facility should be decommissioned will not cure the omission of SEQRA compliance with respect to the critical initial direction to decommission. Thus, this initial direction  itself environmentally significant  must be considered separately. The question before us is whether that decision, taken alone, is "of a ministerial nature" so as to be exempt (ECL 8-0105 [5] [ii]; 6 NYCRR 617.2 [q]).
*431 Respondents maintain that the "action" in question  the direction that Shoreham be decommissioned  is ministerial and therefore exempt because it is mandated by the LIPA statute. But the particular statutory provision (Public Authorities Law § 1020-h [9]) is not the sort of legislative direction on which a claim of ministerial action can be predicated. Section 1020-h (9) provides in pertinent part:
"As soon as practicable after the authority has acquired sufficient shares of LILCO stock to do so * * * the authority shall forthwith close and decommission the Shoreham plant".
The statute contains merely a flat, categorical direction that the ultimate end  the decommissioning of Shoreham  be accomplished. Far from preempting LIPA's discretion, the statute actually affirms it. Section 1020-h (9) does not prescribe when, how, or under what safeguards the decommissioning is to be done and leaves entirely to LIPA the choice of the means and procedures for implementing the decommissioning mandate. The action commanded of LIPA  to decommission Shoreham as it sees fit  is, therefore, one which cannot be deemed ministerial. By no construction can it be "an action performed upon a given state of facts in a prescribed manner imposed by law without the exercise of any judgment or discretion" (6 NYCRR 617.2 [x]).
Moreover, language elsewhere in the LIPA statute compels the conclusion that the Legislature did not intend that any decommissioning of Shoreham done pursuant to section 1020-h (9) should be exempt from SEQRA. Section 1020-s contains a specific SEQRA exemption, but not for decommissioning Shoreham. The SEQRA exemption in section 1020-s (2) is only for "[t]he issuance by the authority of its obligations to acquire the securities or assets of LILCO" or other "action of the authority to effect such acquisition." The inference is plain that if the Legislature had intended to exempt other actions from SEQRA it would have said so (see, McKinney's Cons Laws, Book 1, Statutes § 240 ["expressio unius est exclusio alterius"]).
The order and judgments of the Appellate Division should be reversed, with costs.
In Matter of Citizens For An Orderly Energy Policy v Cuomo: Order affirmed, with costs.
In Matter of Dollard v Long Is. Power Auth.: Judgment affirmed, with costs.
In Matter of Nassau Suffolk Contr.'s Assn. v Public Serv. Commn.: Judgment affirmed, with costs.
NOTES
[1] Both the 1989 Settlement Agreement and the Long Island Power Authority statute call for the decommissioning of the Shoreham facility. Whether LIPA acquires LILCO and becomes the electric utility on Long Island as called for in the statute or Shoreham alone is transferred to LIPA under the Settlement Agreement, all agree that Shoreham will not be operated. The undisputed statements in the brief of the Public Service Commission are that LILCO under no circumstances will operate Shoreham and that "the outcome of [the] appeals [before the New York Court of Appeals] will have no effect on Shoreham's disposition". Moreover, on oral argument counsel for LILCO stated that the steps LILCO had already taken in dissembling the reactor were "irreversible" and "effectively foreclosed" the operation of Shoreham by anybody.
[2] Moreover, the references in the statute to rates charged by LILCO are subjunctive references to hypothetical rates for comparing the actual rates to be charged by LIPA as the power provider if acquisition goes forward (i.e., rates that "will result" [§ 1020-h (1) (b)]) with the hypothetical rates (i.e., rates that "would result if LILCO were to continue in operation" [id.] [emphasis added]). The LILCO rates which are hypothesized for purposes of comparison only, are based on the assumption that what is actually contemplated does not happen, i.e., that acquisition does not occur and that LILCO, not LIPA, remains the power provider.
[3] It is worth noting that the District Court interpreted the goal of the LIPA statute as "establishing a publicly-owned power authority to serve a particular service area in the hope that more reliable and more reasonably priced services for that area would result" (Long Is. Light. Co. v Cuomo, 666 F Supp 370, 405).