OPINION OF THE COURT
 

 Levine, J.
 

 These cross appeals involve the construction of provisions of the Long Island Power Authority Act (Public Authorities Law §§ 1020 — 1020-hh [L 1986, ch 517 (eff Jan. 15, 1987)]), dealing with the obligation of plaintiff Long Island Power Authority (LIPA) to make payments in lieu of taxes (PILOTs) to the defendant local governmental taxing jurisdictions which otherwise would have been due from intervenor plaintiff Long Island Lighting Company (LILCO) except for LIPA’s acquisition of LILCO’s Shoreham Nuclear Power Plant. At issue are: (1) the effective date for substitution of LIPA’s PILOT obligation for LILCO’s real property tax liability on the Shoreham plant; (2) whether and at what level, if any, PILOTs on Shoreham are to continue in perpetuity; and (3) whether LIPA may seek refunds on past PILOTs based upon court challenges to existing assessed valuations of the Shoreham plant.
 

 Enacted in 1986, the LIPA Act created a public power authority having the prerogative to acquire all or part of LILCO’s assets through a negotiated settlement, tender offer for LILCO’s
 
 *509
 
 capital stock or the exercise of eminent domain (Public Authorities Law § 1020-h). The Act further stipulated, however, that upon acquisition of the Shoreham plant, LIPA was to close and decommission the plant "forthwith” (Public Authorities Law § 1020-h [9]).
 

 The LIPA Act gave LIPA tax-exempt status, as a public authority, respecting any property it acquired from LILCO (Public Authorities Law § 1020-p). In recognition of the potentially drastic fiscal impact of the loss of local property tax revenues because of the exemption, the LIPA Act provided for LIPA’s payment of PILOTs to the municipalities and school districts affected by any such acquisition of LILCO property (Public Authorities Law § 1020-q [1]). However, in the case of the Shoreham plant, the Act provided for reduction in the amount of PILOTs over time. Thus, Public Authorities Law § 1020-q (1) provides:
 

 " 1020-q. Payments in lieu of taxes
 

 "1. Each year after property theretofore owned by LILCO is acquired by the authority by any means authorized by this title and, as a consequence, is removed from the tax rolls, the authority shall make payments in lieu of taxes to municipalities and school districts equal to the taxes and assessments which would have been received from year to year by each such jurisdiction if such acquisition had not occurred, except for such taxing jurisdictions which tax the Shoreham plant, in which case the in lieu of tax payments shall in the first year after the acquisition be equal to one hundred percent of the taxes and assessments which would have been received by such taxing jurisdictions. In each succeeding year such in lieu of tax payments shall be decreased by ten percent until such time as such payments equal taxes and assessments which would have been levied on such plant in a nonoperative state.”
 

 In February 1989, then Governor Cuomo, LIPA and LILCO entered into a "Settlement Agreement” for the acquisition by LIPA of only the Shoreham plant, for |
 
 (see, Matter of Citizens For An Orderly Energy Policy v Cuomo,
 
 78 NY2d 398, 408,
 
 rearg denied
 
 79 NY2d 851, 852). The settlement agreement was immediately the subject of a legal challenge in the
 
 Matter of Citizens For An Orderly Energy Policy
 
 case. Transfer of Shore-
 
 *510
 
 ham was blocked until the final disposition of that suit by this Court’s decision upholding the settlement; therefore, the actual transfer of title to LIPA did not occur until February 29, 1992. Nonetheless, the closing and decommissioning of Shoreham proceeded in anticipation of the eventual settlement takeover, to the point where, after authorization from the Federal Nuclear Regulatory Commission, the plant was rendered permanently and irreversibly nonoperative in 1991.
 

 Beginning in 1976, LILCO had challenged overassessment of the Shoreham plant through tax certiorari proceedings under RPTL article 7 against the assessor of the Town of Brookhaven. A joint trial of seven such certiorari proceedings, for the tax years 1976-1977 through 1983-1984 (excluding 1979-1980), known as the "Phase I” tax years, was held in Supreme Court, Suffolk County. The Phase I litigation resulted in a substantial reduction in the assessed valuations of the Shoreham plant and a total tax refund to LILCO of some $34 million plus interest. The judgment was affirmed and is now final
 
 (see, Matter of Long Is. Light. Co. v Assessor for Town of Brookhaven,
 
 202 AD2d 32,
 
 lv denied
 
 85 NY2d 809). A second ("Phase II”) consolidated certiorari trial for the tax years 1984-1985 through 1991-1992 has also been concluded and a decision is pending. The annual assessed valuations of Shoreham had grown in amount with corresponding increases in property taxes of from $60,501,343 in 1987 when the LIPA Act became effective, to $82,066,699 in 1992 when transfer of Shoreham to LIPA was finally achieved. Under a transfer agreement between LILCO and LIPA, LILCO assumed the obligation to fund the PILOTs on Shoreham required under the LIPA Act.
 

 Prior to the transfer of the Shoreham plant to LIPA on February 29, 1992, LILCO had made a payment of one half of the approximately $82 million in taxes due on Shoreham for the tax year 1991-1992, before the statutory deadline of January 10, 1992. Under tax legislation for Suffolk County, the tax year for real property taxes runs from December 1 to November 30 (Suffolk County Tax Act § 13 [b]), and by annual resolution of the Town of Brookhaven the tax liability may be paid without penalty in two equal installments on January 10 and May 31 of each tax year
 
 (see, id.,
 
 § 13 [c]).
 

 Disputes between LIPA, LILCO and the defendant local governmental units continued to exist, however, including litigation delaying the final decommissioning of the plant and disagreement over the effective date when PILOTs were to supersede LILCO’s tax obligation. Before the May 31, 1992 tax
 
 *511
 
 payment was due, the parties entered into an interim agreement providing for the end of litigation involving the decommissioning of the Shoreham plant, for the payment by LIPA (from LILCO sources) of some $41 million to the Town of Brook-haven, without prejudice to the respective positions of the parties, and for two additional payments.
 

 Shortly after the interim agreement was signed, the instant action was commenced. Plaintiffs’ primary claims for relief were a declaration that: (1) LILCO’s responsibility for tax payments attributable to the Shoreham plant terminated upon transfer on February 29, 1992; (2) LIPA’s PILOT responsibility commenced the next day; (3) the plant was "nonoperative” prior to transfer; (4) no further PILOTs were owed because the plant was transferred in a "nonoperative” state; and (5) LILCO and LIPA were entitled to contest the assessments of the Shore-ham plant after takeover upon which PILOTs were based and to seek refunds for overpayments of PILOTs made pending such determination. The defendants’ answers asserted counterclaims seeking declarations that: (1) LILCO was responsible for tax payments through the end of the 1991-1992 tax year, November 30, 1992; (2) LIPA’s PILOT responsibility commenced on December 1, 1992, and each succeeding year the PILOT would decrease by 10% of the preceding year’s payment; (3) LIPA was obligated to make PILOTs in perpetuity of approximately $56 million based upon the tax assessment on the Shoreham plant for the 1985-1986 tax year when it was completely constructed and "nonoperative”, and (4) defendants could use all remedies provided by the Real Property Tax Law and the Suffolk County Tax Act to collect the PILOTs owed by LIPA.
 

 On cross motions for summary judgment, Supreme Court declared,
 
 inter alla,
 
 that: (1) LILCO’s tax liability ceased, and LIPA’s PILOTs began upon the February 29, 1992 transfer of the Shoreham plant; (2) any excess PILOTs based upon a determination reducing the assessed valuation of the Shoreham plant in pending or future tax certiorari proceedings would be subject to full refunds to LIPA and LILCO; (3) the Shoreham plant was nonoperative (i.e., incapable of generating electricity) prior to and on the day of transfer; and (4) Shoreham PILOTS for the first year would be 100% of the taxes and assessments LILCO would have been required to pay had the transfer not occurred, after which PILOTs would be reduced by 10% of the previous year’s amount until the PILOTs equal the taxes and assessments LILCO would have been required to pay on
 
 *512
 
 the Shoreham. plant in a nonoperative state, which payments would then continue in perpetuity.
 

 Plaintiffs and defendants cross-appealed, and the Appellate Division affirmed (195 AD2d 140). After the parties stipulated to dismissals of one unresolved cause of action in the complaint and one contained in a counterclaim, the resultant judgment became final for all purposes; we then granted leave to appeal, and now modify in one respect.
 

 I. The Effective Date for Commencement of PILOTS
 

 In our view, the courts below erred in concluding that LI-PA’s PILOT obligation superseded LILCO’s real property tax liability immediately upon the February 29, 1992 date of transfer of Shoreham. Under the Suffolk County Tax Act, the tax status date for the December 1, 1991-November 30, 1992 taxable year was June 1, 1991 (Suffolk County Tax Act former § 5). Real property taxes owed on the Shoreham plant for the 1991-1992 taxable year became a lien on that property on December 1,1991 (Suffolk County Tax Act § 13 [b]). Thus, Shore-ham’s statutory tax-exempt status as property of LIPA did not go into effect before the June 1, 1991 tax status date for the December 1, 1991-November 30, 1992 taxable year. Moreover, the taxes owed on the Shoreham plant for that year became a lien on the property before it was acquired by LIPA, its present tax-exempt owner.
 

 The well-established general rule is that ownership of real estate on the taxable status date determines whether the property is subject to real property taxation for the entire ensuing taxable year, irrespective of the property’s subsequent acquisition by a tax-exempt entity during that taxable year
 
 (see, People ex rel. Luther v McDermott,
 
 265 NY 47, 51;
 
 Matter of Adams Co. v Nist,
 
 72 AD2d 908, 909;
 
 Young Israel v City of New York,
 
 33 AD2d 561;
 
 Lutheran High School Assn. v City of New York,
 
 29 AD2d 890,
 
 affd
 
 27 NY2d 939,
 
 rearg denied
 
 28 NY2d 859). There is an exception if the acquiring entity is the State or Federal Government, but that exception does not apply where, as here, the tax lien, even if inchoate, has attached to the property before the transfer of ownership
 
 (see, United States v Alabama,
 
 313 US 274, 281-282; 8 Opns Counsel SBEA No. 44; 4 Opns Counsel SBEA No. 60;
 
 cf., Loconti v City of Utica,
 
 61 Misc 2d 855; 1981 Opns St Comp No. 81-7). The lien, of course, cannot be enforced so long as the State or the United States holds title, but the lien itself is not extinguished
 
 (see, United States v. Alabama,
 
 supra; 8 Opns Counsel SBEA No. 44,
 
 op. cit.).
 

 
 *513
 
 The general rule may be overcome by legislation indicating a contrary intention
 
 (see, People ex rel. American Bible Socy. v Commissioners of Taxes & Assessments,
 
 142 NY 348, 350-352;
 
 Rochester Hous. Auth. v Sibley Corp.,
 
 77 Misc 2d 205, 209-210,
 
 affd
 
 47 AD2d 718;
 
 see also, United States v Alabama, supra).
 

 We find no indication, either in the statutory language or legislative history, that the Legislature intended to override the general rule and make Shoreham’s tax-exempt status, triggering LIPA’s PILOT obligation, effective immediately upon acquisition. If anything, the express wording of Public Authorities Law § 1020-q (1) supports the opposite view. Thus, Public Authorities Law § 1020-q (1) provides that annual PILOTs are due "[e]ach year after property theretofore owned by LILCO is acquired by [LIPA] * * *
 
 and,
 
 as a consequence,
 
 is removed from the tax
 
 rolls” (emphasis supplied). Undeniably, however, Shoreham was not finally removed from the tax rolls until July 1, 1992,
 
 [1]
 
 well after the May 31,1992 due date for payment of the final, second half installment of 1991-1992 taxes on the plant. Accordingly, PILOTs (payments
 
 in lieu
 
 of taxes) would not become due until the next succeeding tax payment became due, i.e., for the December 1, 1992-November 30, 1993 taxable year.
 

 We find unpersuasive plaintiffs’ argument that, because the "removed from the tax rolls” language was not repeated in that portion of Public Authorities Law § 1020-q (1) dealing specifically with Shoreham PILOTs, the PILOTs on LIPA’s acquisition of that property should begin immediately upon transfer. There is nothing in the legislative history to indicate an intent by the Legislature to provide for Shoreham PILOT payments out of synchronization with PILOTs on other acquired LILCO properties or out of synchronization with the statutory tax years. Rather, the specific statutory treatment of PILOTs attributable to the Shoreham transfer was intended solely to address the declining payment schedule for Shoreham
 
 *514
 
 PILOTs, differing from PILOTs on other LILCO property acquired by LIPA in only that respect. Likewise, we reject plaintiffs’ argument that provisions of the Suffolk County Tax Act with respect to the tax status date and the effective date of attachment of tax liens, etc., are preempted by the LIPA Act
 
 (see,
 
 Public Authorities Law § 1020-gg). Although the enforcement mechanisms of the Suffolk County Tax Act may not be applied to LIPA, the provisions relied upon by us to determine when PILOTs supersede LILCO’s tax liability on Shoreham are not in conflict with the LIPA Act, which only preempts when LIPA Act provisions are "inconsistent” with other statutory provisions. For the foregoing reasons, the judgment must be modified to declare that LIPA’s PILOT obligation begins with the December 1, 1992-November 30, 1993 taxable year.
 

 II. The Duration of LIPA’s Obligation to Pay PILOTs on the Shoreham Plant
 

 LILCO’s position on this issue is that PILOTs on Shoreham should terminate entirely after the expiration of the first year following LIPA’s acquisition of the Shoreham plant. LILCO, thus, reads Public Authorities Law § 1020-q (1) as requiring PILOTS at 100% of taxes and assessments "in the first year after the acquisition”, and then requiring declining PILOTs
 
 only
 
 "until such time as such payments equal taxes and assessments which would have been levied on such plant in a nonoperative state” (Public Authorities Law § 1020-q [1]). Since no one disputes on this appeal Supreme Court’s declaration that Shoreham was in a nonoperative state at the time of transfer, LILCO argues that PILOTs should have terminated one year after the date of transfer.
 

 We agree with the courts below that the statute is not subject to LILCO’s interpretation. First, LILCO’s reading of the statute would only be tenable if section 1020-q (1) limited the
 
 continuation
 
 of all payments in lieu of taxes to the point when they were the equivalent of taxes and assessments properly levied on the plant in a nonoperative state. The LIPA Act, however, only expressly limits the
 
 decreases
 
 in PILOTs to that point of equivalency to tax levies on a nonoperative facility. Thus, the most reasonable construction of section 1020-q (1) directs gradual reduction of the size of PILOTs until they reach a floor level of taxes and assessments which the taxing jurisdictions would have received from LILCO based upon a properly assessed valuation of a defunct Shoreham plant. Our reading of Public Authorities Law § 1020-q (1) is confirmed by the Assembly sponsor’s legislative memorandum in support of the
 
 *515
 
 LIPA Act proposal, and also by basic real property tax assessment principles. The sponsoring memorandum outlined that, as to the general acquisition of LILCO properties envisaged by the LIPA Act "LIPA is required to make payments in lieu of taxes and assessments to municipalities equal to the taxes and assessments that would have been received if its properties were owned by a private entity” (Mem of Assembly Sponsor, Bill Jacket, L 1986, ch 517, at 13). However, the memorandum further explained, "with respect to the real property on which the Shoreham Nuclear Plant is located, in lieu payments are required in amounts
 
 which phase-down their inordinate and inequitable
 
 size”
 
 (id.
 
 [emphasis supplied]). Thus, although LILCO relies on documents indicating that officials who did not directly participate in the legislative process of enacting the LIPA Act may have interpreted section 1020-q (1) differently, what was contemplated by the Legislature was a "phase down” to PILOTs equivalent to the taxes and assessments which LILCO would have paid based on a properly assessed valuation of the defunct Shoreham plant.
 

 A total elimination of PILOTs on the Shoreham plant in its nonoperative state would have defeated the overriding purpose of Public Authorities Law § 1020-q (1), to provide a substitute stream of municipal revenue on all LILCO property acquired by LIPA, for the taxes which fairly and properly "would have been received from year to year by each [taxing] jurisdiction if such acquisition had not occurred”
 
 (id.).
 
 Even nonoperative property of a public utility has assessable value for purposes of local taxation. In
 
 People ex rel. Lyford v Allen
 
 (286 App Div 621) then-Justice Bergan held that "[e]yen if a railroad is defunct as an entity, the value of its real estate apart from utilization for railroad purposes is not only assessable but it must be assessed 'at the full value thereof ’ ”, and would have remitted to the trial court "to fix the salvage or usable value of the structures” in the absence of a stipulation by the parties to a specified increase in assessment to reflect an estimated approximate value of the utility’s property above the value of the land
 
 (id.,
 
 at 626, 627;
 
 see also, Matter of Onondaga County Water Dist. v Board of Assessors,
 
 39 NY2d 601, 606 [utility’s property assessment may be reduced for "functional obsolescence”]).
 

 Correspondingly here, the LIPA Act concededly contemplated PILOTs of indefinite duration on all acquired LILCO property other than the Shoreham plant to be based upon the level of taxation LILCO would have paid but for LIPA’s acquisition. There is nothing in the statutory language or the legisla
 
 *516
 
 tive history to indicate that the PILOTs on LILCO’s Shoreham property were to be treated differently except to gradually reduce their size to eliminate "inordinate and inequitable” assessments on Shoreham (Bill Jacket, L 1986, ch 517, at 13) and ultimately to reflect its true value as a defunct plant.
 

 It follows from the foregoing that the courts below properly held that PILOTs on the Shoreham plant will continue as a perpetual obligation of LIPA, subject to reduction until its attainment of its legally and properly assessed valuation in a nonoperative state, as determined by way of agreement among the parties to this action, or by a court of competent jurisdiction. We also agree with the Supreme Court and the Appellate Division that the literal language of Public Authorities Law § 1020-q (1) controls regarding the rate of reduction of PILOTs, that is, "[i]n each succeeding year [PILOTs] shall be decreased by ten percent until” the statutory floor is reached. Hence, PILOTS on Shoreham are to be reduced each year by 10% of the PILOT of the preceding year.
 

 III. PILOT Refunds
 

 The remaining major issue to be addressed is whether LIPA is precluded from seeking refunds on past PILOTs for the taxable years following the Shoreham acquisition. Because the first year PILOT is "equal to one hundred percent of the taxes and assessments
 
 which would have been received by
 
 [the defendant] taxing jurisdictions [had the takeover not occurred]” (Public Authorities Law § 1020-q [1] [emphasis supplied]), and the PILOTS for subsequent years are calculated off of that initial figure
 
 (id.),
 
 a reduction in Shoreham’s assessed valuation for the first PILOT year would reduce the taxes that "would have been received” but for the takeover and, thus, directly reduce the statutorily required PILOT payments.
 

 The defendants rely on Public Authorities Law § 1020-q (3) to support their position that LIPA is precluded from seeking refunds on past PILOTs through challenges to assessed valuations of the Shoreham plant. Section 1020-q (3) provides that no local governmental taxing jurisdiction "shall be liable to [LIPA] or any other entity for a refund of property taxes originally assessed against the Shoreham plant”. That section also bars recovery of any refund from any such taxing jurisdiction of taxes previously paid, which refund may have become due as a result of a "judicial determination that the Shoreham plant assessment was excessive, unequal or unlawful for any of the years from [1976] to the effective date of this title”. Finally,
 
 *517
 
 section 1020-q (3) directs that LIPA was to "discontinue and abandon all proceedings, brought by its predecessor in interest, which seek the repayment of all or part of the taxes assessed against the Shoreham plant”.
 

 In
 
 Matter of Long Is. Light. Co. v Assessor of Town of Brook-haven
 
 (154 AD2d 188), the Appellate Division held that Public Authorities Law § 1020-q (3) was unconstitutional to the extent that it purported to bar LILCO (as "any other entity”) from enforcing its right to tax refunds for overassessments of Shore-ham in pending tax certiorari proceedings. Defendants are correct in noting that, as a State governmental entity, LIPA does not enjoy the constitutional protection afforded a privately owned utility such as LILCO.
 

 Nonetheless, we agree with the courts below that Public Authorities Law § 1020-q (3) should not be read as completely immunizing the various taxing jurisdictions from refund liability for PILOT overpayments based upon inflated assessed valuations of Shoreham following enactment of the LIPA Act. The plain language of Public Authorities Law § 1020-q (3) does not prohibit an action by LIPA to recover PILOT overpayments
 
 (cf.,
 
 Public Authorities Law § 1020-f [a] [LIPA has authority to sue and be sued]). Section 1020-q (3) bespeaks of a legislative intent limited to relieving the local taxing jurisdictions from the drastic impact of substantial refund liability for
 
 past taxes and assessments
 
 challenged by LILCO, not PILOTs prospectively imposed following LIPA’s acquisition of the Shoreham plant. Thus, section 1020-q (3) prevents refund liability for "property
 
 taxes originally
 
 assessed” (emphasis supplied) against the Shoreham plant, or for "refund[s] of taxes” based upon a judicial determination of overassessed evaluation "for any of the years from [1976]
 
 to the effective date of this title
 
 [January 15, 1987]” (emphasis supplied). Similarly, LIPA is only directed to discontinue the prior tax certiorari proceedings of "its predecessor in interest”, which can only refer to challenges to taxes assessed while LILCO (LIPA’s predecessor in interest) was the owner of the Shoreham plant, not proceedings challenging the level of PILOTs imposed after LIPA acquired the plant. While section 1020-q looks backward to taxes previously assessed, defendants’ liability for PILOT refunds was, as of the effective date of the Act, wholly prospective. Thus, the plain language of Public Authorities Law § 1020-q (3) limits its application to proceedings to recover taxes overpaid during a specific period of time.
 

 Our limited reading of section 1020-q (3) is consistent with the legislative history of the LIPA Act. As previously noted,
 
 *518
 
 the Assembly sponsoring memorandum expressed conviction that, at the time of passage of the LIPA Act, taxes were already of "inordinate and inequitable size” (Mem of Assembly Sponsor, Bill Jacket, L 1986, ch 517, at 13). In the Assembly debates on the proposed LIPA legislation, the then current taxes and assessments on Shoreham were characterized as a "windfall” which "no longer should be allowed” (Member of Assembly Harenberg, Assembly Floor Debates, July 1, 1986, at 369). It would be entirely inconsistent with this view of the inflated status of taxes and assessments on the Shoreham plant at the time of enactment of the LIPA statute to ascribe to the Legislature an intent to permit the local taxing jurisdictions to increase the size of payments in lieu of such taxes and assessments, totally insulated from judicial review by a LIPA challenge to assessed valuations and a demand for refunds of PILOT overpayments based thereon. In light of the plain language of the statute and this legislative history, the defendants’ position on this issue, which would in effect leave LIPA at the discretion of local assessors in determining the magnitude of PILOTS after a Shoreham takeover, cannot prevail.
 
 [2]
 
 Thus, we leave undisturbed the determination of the courts below on the refund issue.
 

 Accordingly, the judgment appealed from and the order of the Appellate Division brought up for review should be modified, without costs, in accordance with the opinion herein and, as so modified, affirmed.
 

 Chief Judge Kaye and Judges Simons, Titone, Bellacosa, Smith and Ciparick concur.
 

 Judgment appealed from and order of the Appellate Division brought up for review modified, etc.
 

 [1]
 

 . The tax roll refers to the final assessment roll upon which the property taxes due for that year have been entered and to which a warrant authorizing their collection has been annexed
 
 (see,
 
 RPTL 900 [1]; 904 [2]). As the assessed valuation of both taxable and exempt property is entered on the assessment roll
 
 (see,
 
 RPTL 502 [5]), previously taxable property is effectively removed from the tax roll when the final assessment roll is filed with the city or town clerk as required by law
 
 (see,
 
 RPTL 516) with the subject property listed on the exempt portion of the roll. By chapter 611 of the Laws of 1990, the 1992 Suffolk County tax status date became March 1, and the date for completion and filing of the final assessment roll in Suffolk County became July 1.
 

 [2]
 

 . The Library District’s additional argument that a declaration as to the availability of PILOT refunds is unenforceable as against it because it lacks statutory tax refund authorization (see, 1995 Opns St Comp No. 95-15) is unpreserved for our review.